## Hamilton, et al. v. Kentucky Title Savings Bank & Trust Company.

(Decided June 19, 1914.)

### Appeal from Montgomery Circuit Court.

1. Usury—What Is Not a Loan or Forbearance of Money.—When one allows a debtor for a consideration to prepay a debt, it is not a loan or forbearance of money. The privilege of prepaying a debt is as much the subject of sale as any other chattel, and a creditor has as much right to sell or discount negotiable paper to the payer as to any other person, and the discount or proceeds of the sale should not for that reason be considered usury.

2. Usury—When Payment of Sum for Release of Mortgage Not Usury.—Where there was default of payment of a bond and in-

terest upon a loan aggregating $105,000, and the mortgagee accepted payment from the mortgagor who had borrowed the money from another source, the payment to the mortgagee of $1.050 as a prerequisite to the release was not usury, but a consideration for the surrender of the right to carry the loan for a period of years it had yet to run, the mortgagor never having instituted suit, nor taken any step which could be held as a waiver of the right to further carry the loan.

ROBERT H. WINN, R. G. KERN for appellants.

KEITH L. BULLITT and BRUCE & BULLITT for appellee.

OPINION OF THE COURT BY JUDGE NUNN—Affirming.

In 1907, the appellants, George G. Hamilton and J. Carroll Hamilton, became indebted to the appellee, Kentucky Title Savings Bank & Trust Company in two loans aggregating the sum of $105,000. $40,000 of it was secured by mortgage on 835 acres of Bath and Montgomery county land, and $65,000 of it was secured by mortgage on 1,150 acres of Bath county land. The loans ran ten years, that is, the principal sum on each loan was payable in ten equal annual installments. The interest was payable semi-annually. These installment bonds for the principal and interest were, by the terms of the mortgages, negotiable. The mortgages further provided that for any failure by the Hamiltons to pay the taxes or insurance, or should they fail to pay within thirty days after maturity any of such bonds or interest coupons:

"Then in any of such cases the holder of any such overdue bond or coupon on demand may declare all the bonds hereby secured to be immediately due and may forthwith enforce this mortgage therefor; and in any such cases the Kentucky Title Savings Bank may forthwith enter on said premises and collect and apply the rents and profits therefor, first to the payment of a reasonable compensation to itself, including attorney's fees, for its services, and next the pro rata satisfaction of the debts and demands hereby secured, and such compensation and fees shall become a part of the debt hereby secured."

In the Autumn of 1909 the Hamiltons were in default in the payment of a past due $4,000 bond, a past due $6,500 bond, six months interest ($1,200) on the first named debt, and one year's interest ($3,900) on the sec-

ond debt, making a total of $15,600 in arrears. Early in January, 1910, the Hamiltons secured a loan from the Northwestern Mutual Life Insurance Company for $115,000, a sum sufficient to pay all of the bank debt and interest. This Northwestern loan was secured by mortgage on the same lands, and was on a 5 per cent basis, and was obtained for the purpose of paying the bank debt which was drawing 6 per cent; but a pre-requisite, of course, to the Northwestern loan was the cancellation and release of the bank debt and mortgages. The bank and the Northwestern each sent a representative to Mt. Sterling, one to turn over the money on the new loan, the other to receive it and satisfy of record the mortgages. At the same time, the Hamiltons paid to the bank representative $1,050 in addition to the debt and interest. This payment, it will be noticed, is equivalent to 1 per cent on the principal debt of the bank.

This suit was brought by the Hamiltons against the bank to recover that sum, $1,050. Their right of recovery is the only question involved on this appeal. Their suit was based on the idea "that same was exacted and was wrongfully and *usuriously* charged and collected by the defendant; that it, the defendant, refused to release its mortgages save upon the payment of said $1,050 of usurious interest, nor could this plaintiff secure the money upon their said new loan and mortgage upon said premises above named, save after the release of the defendant's mortgages."

The bank admits that it received this excess sum, but denies that it was paid in the way of usury, or that it is usury in any sense. On the contrary it says that its debt still had a period of eight years to run, and that the Hamiltons were desirous of paying off the bank debt which drew 6 per cent interest by borrowing the money elsewhere at 5 per cent, thus saving the difference of 1 per cent for a period of eight years, or approximately $4,500, and to this end the bank contends that the $1,050 was paid to it as a consideration for its surrender of a valuable right, that is, a right to carry the loan for eight years longer, and earn the amount of interest which the Hamiltons had contracted to pay; in other words, it insists that it surrendered a valuable right for a consideration of $1,050.

Kentucky Statutes, section 2219, thus defines and invalidates usurious interest: "All contracts and assurances made, directly or indirectly, *for the loan or for-*

*bearance of money,* or other thing of value, at a greater rate than legal interest, shall be void for the excess over the legal interest.''

We concur with appellee's view of the law that this payment can not be considered as having been made for a loan or forbearance. When one allows a debtor for a consideration to prepay a debt, it is not a loan or forbearance of money; rather the converse. The privilege of prepaying a debt is as much the subject of sale as any other chattel, and a creditor has as much right to sell or discount negotiable paper to the payor, as to any other person, and the discount or proceeds of the sale should not for that reason be considered usury. The Hamiltons do not seriously dispute this proposition, and by brief they concede that the word usurious as used in their petition does not accurately describe the transaction; in other words, it is a misnomer. They admit that if the Hamiltons agreed to pay this sum for the right to cancel their debt before maturity, its receipt by the bank would not be unlawful. The case of Young v. Miller, 7 B. Monroe, 540, supports this view:

"It is going far enough to say that the purchaser, on payment of a note by the debtor himself before it is due, at a discount greater than the rate of six per cent for the time the note has to run, or for a sum on which a greater rate of interest is charged for the same time, as a means of ascertaining the extent of the purchase or of the payment, is not usurious. There being, however, neither a loan nor the forbearance of a debt, if the transaction is in good faith, either a purchase or a payment, the prohibition of the usury laws does not directly apply.''

But from other facts set up in their petition, the Hamiltons seek to recover this fund upon the ground that the bank knew, and took advantage of, their weakened financial condition, and threatened to enter upon and take possession of the mortgaged premises and precipitate the whole debt, and that such a course by the bank would mean their utter ruin; that by reason of some serious domestic troubles, and financial reverses, they were, for the time, unable to liquidate the principal and interest bonds past due, and until the bank would release its mortgages of record, they could not borrow any sum elsewhere; that in this way, and under such circumstances, the Hamiltons were coerced and put in duress, and in

order to save their property, they were compelled to pay it before maturity; that this is a form of coercion on the part of the bank which gives the Hamiltons a legal and moral right to recover.

As to the facts, there is a stipulation in the record explaining why the Hamiltons did not testify. The explanation is that neither of them had any communication with the bank with reference to the defaulted payments, or cancellation of the indebtedness; that all the negotiations in their behalf were conducted by two gentlemen, one their attorney, and the other a friend. It is conceded that they were in default on the interest and annual installment bonds then due, and that the bank had been very insistent upon the payment of all arrears, and, appellants say, had even been threatening to precipitate the entire debt by declaring it all due, as it had a right to do under the terms of the contract, and it even reminded the Hamiltons that it could enter and take possession. The Hamiltons' attorney conferred with the bank at Louisville about this matter once or twice in October, and again a few days before Christmas, when their friend, above referred to, was present. The purpose of these visits was to get the bank to agree to accept a present payment of its indebtedness, and surrender its right to carry the loan for the full contract term. It is apparent that the Hamiltons, since they got in arrears, had also been negotiating with the Northwestern for the five per cent loan. Hamilton's witnesses testify that they understood or were impressed from Mr. Swearingen's conversation (the bank's President) that the bank fully intended to take steps to collect its whole debt, or that if the Hamiltons did not pay same, the bank would take their property, but as soon as the bank found out that they could get their money, or ascertained that these negotiations with the Northwestern Company were pending, that it insisted upon the payment of the bonus in question for a surrender of its right. Rather, when it found it could get the whole debt paid, it did not want it.

As above indicated, neither of these witnesses of the Hamiltons undertake to detail the words, or their substance, which the bank president used on either of these occasions. They merely testify as to impressions they gained, or the understanding they had of the bank's intention. Their evidence, as we take it, does not show that the bank was making demand for payment of anything

more than the amount which the Hamiltons were in default.

For the bank, Mr. Swearingen testifies that after the Hamiltons got behind, he was insisting on them living up to their contract, and paying the interest and principal sums as they became due, but that he never at any time demanded payment of the whole debt, and did not want to do that if it could be avoided. While he says he knew his rights under the contract, and may have remined the Hamiltons of them—he presumed the Hamiltons knew them also—yet he never threatened to declare the whole debt due. On the contrary he was careful not to do so, for he says the bank preferred to carry the debt rather than cancel it. He explains that it was the business and custom of this bank to borrow money at 5 per cent, and put it out on long term loans, such as the Hamilton's at 6 per cent, and that the bonds or notes evidencing the loans were negotiated, and came into the hands of other holders, with the mortgage pledged and held by trustee. In this way, these bonds being in the hands of third persons, it was troublesome and inconvenient for the bank to locate them and secure consent of the holders that the debt might be paid before maturity; and that if the bank had been permitted to carry the debt, it would have earned a profit, from that time, of approximately $4.500, and that it surrendered such possible profit for a cash consideration of $1,050.

Appellants answer this by reference to Swearingen's evidence which shows the bank was able to locate and satisfy these bondholders promptly, and did reloan the money to other parties without delay, so that in fact it suffered very little, if any, loss. If this were material, it is answered by the suggestion that the sole motive of the Hamiltons in getting in arrears, and in seeking to anticipate the debt, was in order to save the difference between the 6 per cent, which it was paying on the present debt, and the 5 per cent which it was to pay on the new one.

On the theory that this $1,050 was coerced, appellants rely in the first place upon the authority of 30 Cyc., 1308:

"Where a person unlawfully demanding a payment is in a position to seize or detain the goods or other personal property of a person against whom the claim is made, without a resort to judicial proceedings in which the parties may contest the validity of the claim, pay-

ment under protest to recover or retain the property will be considered as made under compulsion, and the money can be recovered back.''

For this rule to apply it must appear that the payment was unlawfully demanded, and that it was made under protest. We fail to see how it can be claimed that the facts bring this case within either requisite. It was not unlawful for the bank to insist upon carrying the debt until maturity or demand a cash consideration for surrendering this right. The two gentlemen above referred to, who testified for the Hamiltons, say that they argued with Swearingen in an endeavor to have him voluntarily agree to a pre-payment, but that he would not consent to do so except upon payment of this additional sum. While these witnesses protested to Swearingen against the injustice of it, and say they never agreed to pay it because, in fact, they had no authority from the Hamiltons so to do, at the same time the Hamiltons proceeded with their negotiations with the Northwestern Company for the new loan, secured it, and arranged with the bank to send a representative to Mt. Sterling to cancel the debt, and release the mortgage, and the whole debt was then and there paid, together with this sum in question. We must presume that it was done voluntarily, and in accordance with the bank's demand at the prior conversation related by Hamilton's witnesses, for there is no testimony as to what occurred at Mt. Sterling other than the simple facts above related.

Appellants also rely upon the case of Kilpatrick v. Germania Life Insurance Co., 183 N. Y., 163, where a creditor had loaned his debtor eighty thousand dollars ($80,000) with a stipulation in the mortgage that upon default in payment the creditor might declare the whole debt due. Upon becoming delinquent in the payment of interest installments the creditor instituted a foreclosure proceeding; whereupon the debtor arranged a mortgage loan for $95,000 with another lender on the same premises, and notified the creditor of that fact and of his purpose to pay off the $80,000 debt and interest; thereupon the creditor, finding that it could get its money changed its position, dismissed its foreclosure proceeding, and declared that it would not accept payment save upon the additional payment of $1,000. The debtor paid the note and the $1,000 additional demanded, thereby securing the release of its mortgage, the payment being made out of the proceeds of the new mortgage, which he

then executed. He sued to recover the thousand dollars. The court upheld the recovery upon the idea that the debtor was under duress where he had to submit himself to the exaction of the $1,000 in order to make ready his title for the new mortgage and in order to save himself and his property from ruin.

There are several points in the Kilpatrick case radically different from the one here. The creditor had declared the whole debt due, and actually instituted a suit to foreclose. Having precipitated the debt, the court, of course, held that it had waived its privilege to insist upon a continuance of the loan, and the debtor thereby acquired the absolute right to pay the entire debt.

This same distinction applies in the other case cited by appellants.

We do not find any proof that appellee bank had precipitated the debt. It had never instituted suit, nor taken any step which could be held as a waiver on its part to further carry the loan.

The lower court took this view of the case, and its judgment is therefore affirmed.