## ANGELUS BUILDING & INVESTMENT CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 6579.

Circuit Court of Appeals, Ninth Circuit. March 21, 1932.

George Bouchard and Joseph D. Brady, both of Los Angeles, Cal., for appellant.

G. A. Youngquist, Asst. Atty. Gen., and Sewall Key and John G. Remey, Sp. Assts. to Atty. Gen., for respondent.

Before WILBUR and SAWTELLE, Circuit Judges, and JAMES, District Judge.

JAMES, District Judge.

In this proceeding, brought by the petitioner corporation, to review a decision of the Board of Tax Appeals, there is presented the question whether certain payments, made by the petitioner in 1922 to persons listed as holders of its stock, are to be considered as dividends, or as interest on money borrowed. If the former, they were not deductible from gross revenue in computing income tax; if the latter, they were deductible. The Commissioner held that the payments were dividends distributed to shareholders, and hence were not deductible. The Board of Tax Appeals approved that ruling.

By the Revenue Act of 1921 (42 Stat. 227), § 201, dividends, not deductible from gross income, are defined as: "Any distribution made by a corporation to its shareholders or members, whether in cash or in other property, out of its earnings or profits. * * * "

Treasury Regulations (62—art. 564), in force at the time material here, provided that: "So-called interest on preferred stock, which is in reality a dividend thereon, cannot be deducted in arriving at a net income."

Petitioner was organized as a "family corporation" in the year 1910, having for its general purposes the subdivision and sale of real estate. Up to December 31, 1919, A. H. Braly and Herman Janss, brothers-in-law, owned all of the issued corporate stock. Prior to the date last mentioned, J. H. Braly, father of A. H. Braly and of Mrs. Janss, had loaned to the petitioner large sums of money. A. H. Braly had advanced money for use in the business of the company. The brothers-in-law had also owned what was known as Braly-Janss Investment Company in equal shares, the assets of which had been transferred to petitioner, at the stated value of $70,000; A. H. Braly and Herman Janss taking credit on petitioner's books by open account in the amount of $35,000 each.

On December 31, 1919, all stock issued was canceled and reissued in several amounts. As J. H. Braly, the father, was then a man 88 years of age, his sons, A. H. Braly and H. H. Braly, and daughter, Mrs. Janss, were designated to act as his trustees. Stock was issued to them at par in amount sufficient to cover the sum of his cash loans or advances to petitioner, which at the time were in excess of $200,000. Stock was also

issued to cover amounts carried on open account to the credit of A. H. Braly and Herman Janss. Additional stock was issued separately to A. H. Braly which was apparently for cash. Other changes in and additions to the stock issue were subsequently made, which are not necessary to be detailed. On all of the stock there was distributed during the year in question sums equivalent to 7 per cent. on par. These payments were entered on the books of the corporation as "interest," and no dividend account was carried. The petitioner claimed that the transactions whereby stock was issued to J. H. Braly's trustees to cover amounts advanced by J. H. Braly, and to A. H. Braly in amount equivalent to his open account credit, were mere forms and did not convert the "loans" into stock purchases. In income returns for prior years (1920 and 1921) the petitioner had included these alleged loan amounts as "invested capital."

On January 18, 1920, J. H. Braly's trustees signed with the petitioner an agreement which first recited that, as the corporation had sold and transferred to the trustees "certain certificates of corporate stock" for cash, the trustees agreed to resell the stock to the corporation upon payment by it of the full price of $1 per share, "together with an amount equal to 6 per cent. interest per annum, compounded quarterly from the date of issuance of said first mentioned certificate." A. H. Braly at the same time in writing agreed to pay the interest specified "until said stock is taken up by first party." A further agreement of date April, 1922 (the tax year concerned herein), changed the interest agreed to be paid to 7 per cent. on the repurchase of the stock, with the added conditions that none of the parties concerned would dispose of the shares without the consent of the others, and that the assets of the corporation would not be disposed of except as necessary in the proper conduct of the business. It was also stated that the stock issued to Braly trustees and to A. H. Braly should be considered as "preferred stock and guaranteed dividends in an amount equal to 7 per cent."

Repurchase agreements are by no means unusual in sales transactions involving corporate stock. As stated, the claim of the petitioner is that it never treated the stock issued to cover advances made by the several parties, as converting the loan accounts into any different form of obligation; and never intended so to do. Mr. A. H. Braly testified as follows: "We wanted to get it in more convenient form, and we also wanted something behind that account. Therefore we decided as a convenience and more as a matter of bookkeeping to issue stock to him and myself for the indebtedness with a rate of interest specified to us so that we could retire the stock as money came in. We thought this would be more convenient than trying to give securities in the shape of mortgages. It would be more difficult to release those than to reissue stock."

Plainly it was the intention that the recipients of the stock should be, in their relation to the corporation, vested with the rights of stockholders. How else could the share representation put "something behind" the accounts as A. H. Braly said was desired. By plain interpretation, stock representation was what was intended to be given, and it was given.

■■ A taxpayer cannot, by a form of book entry, merely, change the amount of an income total. Can it be doubted that, had the status of the Braly trustees, and A. H. Braly, as stockholders, been challenged by a stranger with an interest, the trustees and Braly would have stoutly maintained their right to the shares for what they purported to be? Otherwise, how could the possession of the certificates have protected them in the way Mr. A. H. Braly testified it was designed they should be protected. The charging of the amounts of money received from these sources to invested capital in former years (1920–1921); the payment of the same rate of "interest" to all stockholders out of profits; the recitals in the agreement first mentioned that the stock had been "sold and transferred" to the Braly trustees; are all facts indicating that the holders of the certificates were to be invested with the character of stockholders of the corporation. The Commissioner was therefore authorized to conclude that the payments made by the company to all stockholders constituted a division of profits in proportion to shares, and that they were, within the meaning of the Revenue Law, "dividends." Whether the attempt to change the form of the stock from "common" to "preferred" was effectual or not would make no difference in the result in the income tax computation [Elko Lamoille Power Co. v. Commissioner (C. C. A.) 50 F. (2d) 595, this circuit]; neither would the written agreements shown to have been made, in our view, in any wise change the relation of the parties, or convert that relation into something different from the

ordinary one existing between a corporation and its shareholders.

■■ But petitioner has a further contention to urge against the tax assessment: That has to do with the provisions of the Corporate Securities Act of California (St. 1917, p. 673, as amended). That act, designed to give state supervision over the stock issues of corporations for the protection mainly of the investing public, requires that permits must be secured from the state Corporation Commissioner before shares are issued and sold or transferred. It declares that any stock disposed of without such a permit having been first secured shall be void. The contention in essence is that, when shares are issued in violation of the state law, dividends actually paid to persons, the holders of such stock, out of the profits of the corporation, cannot be taken account of in estimating income taxes due the government. If this contention is valid, then a convenient method is made available by which income taxes required to be paid by corporations may be materially reduced in amount. The government in the collection of its revenues takes no notice of any situation of accountability to a state that the taxpayer may have caused to exist through his own wrongdoing. His transactions are as he has made them, and, if real income credits have been created which are subject to be taxed, they are to be assessed accordingly. Thus income derived from an unlawful business may be made to pay its toll in taxes in the same percentages as that which is reaped from legitimate enterprises.

The following decisions, as cited by respondent, are in their general effect applicable: California Iron Yards Co. v. Commissioner (C. C. A.) 47 F.(2d) 514; Fidelity-Philadelphia Trust Co. v. Commissioner, 47 F.(2d) 36, 38 (C. C. A. 3). In the case last noted, the court said: "It is well settled that a state law cannot be given an effect for tax purposes which conflicts with the provisions of a federal revenue law and defeats the collection of the tax."

Petitioner, subsequent to the submission of this case on oral argument, filed an additional list of authorities. The most pertinent of these is Garrison Co. v. Commissioner, 55 F.(2d) 589, 591, decided by the Circuit Court of Appeals for the 8th Circuit on January 25, 1932. The court there decided that promissory notes given to an Arkansas corporation for its stock, where the Constitution of that state forbade the taking of notes in payment of corporate shares, could not be properly included as a part of the invested capital of the company concerned. It had been held by the Supreme Court of Arkansas that such notes could not be recovered upon in a suit against the maker by reason of the constitutional provision. The decision does not furnish a rule which, under the facts here, will determine the judgment to be made. The Circuit Court in the Garrison Company Case particularly referred to the argument made on the part of the Commission, which was in brief: " * * * That results from transactions that are in violation of state law, and not enforceable contracts in the state, are still recognized for federal tax purposes if they are of a kind that would otherwise come within the Revenue Acts."

And the court said: "It is unnecessary to discuss the proposition thus generally stated for the reason that the transaction in the case at bar does not come within its terms."

Treasury regulations are then quoted, wherein it is provided that: "Enforcible notes or other evidences of indebtedness * * * may be considered as tangible property in computing * * * invested capital to the extent of the actual cash value of such notes. * * *" And the court went on to say: "It is plain from the language of the regulation that the promissory notes in the case at bar could not be considered tangible property in computing the corporation's 'invested capital.' * * *"

That is, as the notes were not enforceable (the reasons which made them so are immaterial), they did not come within the descriptions of the regulations, but were by the general terms of such regulations excluded from "invested capital."

The case of Strother v. Commissioner, 55 F.(2d) 626, decided by the Circuit Court of Appeals of the Fourth Circuit on January 25, 1932, also cited by petitioner, is not considered applicable here. Quite pertinent to the subject discussed are the observations of this court as made in Osburn California Corporation v. Welch, 39 F.(2d) 41, 42. There the court, by Judge Rudkin, said: "It is contended that the Dominguez stock became capital in the hands of the Osburn Corporation, because section 11 of article 12 of the California Constitution provides that no corporation shall issue stock or bonds except for money paid, labor done, or property actually received, and that Congress can only tax income as distinguished from capital. But Congress has power to impose

a tax upon incomes and, as an incident, to define what shall constitute income; and the power of Congress in that regard is not limited or circumscribed by the laws of the several states."

We are of the opinion that the decision of the Board of Tax Appeals should be affirmed.

It is so ordered.