**BELL BAKERIES, INC., v. JEFFERSON STANDARD LIFE INSURANCE COMPANY.**

(Filed 1 February, 1957.)

**1. Usury § 1: Mortgages § 11—**

A provision in a deed of trust that the borrower should pay a premium, in addition to accrued interest at the legal rate, upon the exercise of its privilege of prepaying the notes before maturity, is valid. G.S. 22-4.

**2. Mortgages § 11—**

A provision in notes and deed of trust securing same that the borrower should maintain a working capital in a specified amount and should not pay dividends on its stock when the payment of such dividends would reduce its working capital below the minimum specified, is valid.

**3. Same: Corporations § 16—**

The borrower was a wholly owned subsidiary, the parent corporation being the owner of all its common stock. The subsidiary undertook to pay interest on the parent corporation's debentures. *Held:* The payment of the interest on the parent company's debentures, being based solely on the ownership by the parent corporation of the common stock of the subsidiary, is sufficiently analogous to the payment of a dividend by the subsidiary to justify the lender in asserting that such payment constituted the payment of a dividend within the terms of its loan agreement proscribing the payment of dividends by the borrower which would reduce its working capital below a specified amount.

**4. Duress—**

A threat to do what one has a legal right to do cannot constitute duress.

**5. Mortgages § 11—Lender's threat to declare default if borrower violated conditions of deed of trust cannot constitute duress.**

The notes and deed of trust in question stipulated that the borrower should not pay dividends on its stock if such payment reduced its working capital below a stipulated amount. After dispute between the borrower and lender as to whether the payment by the borrower of interest due on the debentures of the borrower's parent corporation constituted a payment of dividends by the borrower, the borrower made such payment. The lender waived the asserted breach, but advised the borrower that another such payment would be treated as a default, and suggested that if the borrower did not wish to comply, it should refinance the loan. The borrower, upon its election to refinance the loan, was required by the lender to pay the premium stipulated for the privilege of prepayment. The borrower instituted this action asserting that it was forced to refinance the loan, which was not in default, because of the irreparable injury that would result from a declaration of default, that the refinancing was thus under duress, and sought to recover the amount paid by it for the privilege of prepayment and the cost of refinancing the loan. *Held:* The lender had the right to call the borrower's attention to the terms of the agreement and to inform it that upon failure to comply, the lender would exercise its legal contractual rights, and, there being no evidence that the lender acted in bad faith in asserting its rights, nonsuit was proper.

WINBORNE, C. J., took no part in the consideration or decision of this case.
JOHNSON, J., not sitting.

APPEAL by plaintiff from *Hobgood, J.,* Second April Civil Term of WAKE.

Plaintiff seeks to recover moneys asserted to have been paid to defendant as a result of duress and in addition expenses incurred because of the asserted duress.

The complaint alleges in substance: that plaintiff, a Delaware corporation engaged in the baking business in North Carolina and several other states on 1 November 1947, borrowed from defendant the sum of $785,000; that the debt thus created was evidenced by bonds which

were secured by deed of trust conveying real and personal property of plaintiff in North Carolina and several other states; that plaintiff is the wholly owned subsidiary and sole source of income of Liberty Baking Corporation (hereafter referred to as Liberty); that prior to 1944 plaintiff had obligated itself to pay all amounts required to be paid on the outstanding preferred stock of Liberty and pursuant to its agreement had provided funds for Liberty to meets its dividend requirements in 1944, 1945, and 1946 in an aggregate sum of $68,932.50; that on 31 December 1947 dividends had accumulated on Liberty's preferred stock to the amount of $37.50, and on 1 January 1948 Liberty issued debenture bonds in exchange for its outstanding preferred stock at which time plaintiff obligated itself to pay the interest installments on the debentures; that pursuant to its agreement with Liberty plaintiff paid interest on Liberty's debentures as follows: 1948, $11,237; 1949, $29,341.80; 1950, $46,752.30; 1951, $62,974.80; that these payments were shown on financial statements furnished defendant by plaintiff; that defendant knew of plaintiff's obligation to Liberty and acquiesced in the payments made by plaintiff from 1944 to December 1951; that the deed of trust of 1 November 1947 securing the bonds issued to defendant contained covenants that plaintiff would at all times maintain a net working capital of at least $75,000 and would not, without the consent of the majority of its bondholders, pay any cash dividend on any of its capital stock or retire any of its capital stock if after such payment or retirement plaintiff's earned surplus did not equal or exceed $200,000; that in 1950 there was a deficiency in working capital, and defendant requested plaintiff not to pay dividends or retire capital stock if after such payment the working capital was less than $200,000; that plaintiff assented to the request and the deed of trust was modified accordingly; that in January 1952, when plaintiff was not in default under any provision of its deed of trust, defendant arbitrarily and without any semblance of right demanded that plaintiff agree not to make any further payments on Liberty's debentures unless after such payment plaintiff had a minimum working capital of $200,000 and demanded that plaintiff refinance its debt to defendant if plaintiff was unwilling to meet its demand; that defendant asserted that such payments would be a violation of the covenants contained in the deed of trust as amended in 1950; that plaintiff denied defendant's construction of the agreement and insisted that it had a right under the trust to make payments of the interest on Liberty's debentures; that because of defendant's arbitrary attitude and its unjust and unwarranted demand and a threat to declare a default and foreclose plaintiff's equity, plaintiff negotiated a loan to enable it to pay off the bonds held by defendant, knowing that if a default were in fact declared, irreparable damage would be done to plaintiff's financial standing; that when plaintiff had

obtained a commitment for a new loan, defendant wrongfully demanded a premium of 5% before it would accept payment of the bonds held by it and the cancellation of the deed of trust; that plaintiff, under compulsion and the threat of a declared default and to save its credit and property, yielded to the demand of defendant and paid to it $502,400, the unpaid principal of its bonds plus interest accrued thereon amounting to $3,279.56 and under protest a 5% premium wrongfully demanded in the amount of $25,120; that said premium was paid "under business compulsion, coercion, and duress, and made the payment as the only alternative to suffering great financial loss and perhaps the wrecking of its business as a result of the action threatened by defendant"; that plaintiff incurred an expense of $26,053 in obtaining a new loan, which expense was a direct result of defendant's wrongful act in threatening a foreclosure of plaintiff's properties. Plaintiff seeks to recover the sum of $51,173.

Defendant, by its answer, avers that it has no contractual relations with Liberty and has no information with respect to any payment made by plaintiff to Liberty prior to November 1947 or knowledge of Liberty's source of income or any amounts accrued on the preferred stock of Liberty in December 1947. It denies it was informed of the issuance of debentures by Liberty or of any arrangement between plaintiff and Liberty for payment of interest to accrue on the debentures, asserting that any such arrangement was subject to the provisions of the deed of trust securing the debt owing it; it admits notifying plaintiff on several occasions that it expected plaintiff to comply with the terms and provisions of the deed of trust. It denies any wrongful demand or coercion, admits that the debt owing it was paid to it before maturity and in addition a premium of 5% was paid, asserting that the payment was voluntary and the premium legal and in conformity with the provisions of the deed of trust and the notes thereby secured. The answer sets out provisions of the deed of trust which it asserts were violated by plaintiff. It avers that it sought compliance with the provisions of said deed of trust and made no threats not fully supported by the provisions of the deed of trust. It avers that the premium paid was less than the amount expressly provided for in the notes and deed of trust.

The deed of trust annexed to the complaint and admitted by the answer to be correct provides for fifty 5% first mortgage bonds, each in the sum of $15,700. The bonds are dated 1 November 1947, bear interest at the rate of 5% per annum from that date, are payable as to principal on the first days of February, May, August, and November, the first note being due 1 February 1948, interest being payable on the dates when a principal note is payable. The notes and deed of trust contain this provision:

"At any one time, or from time to time, on any interest date one of the bonds of this issue may at the option of THE COMPANY, which option shall be non-cumulative, be redeemed prior to maturity, at One Hundred (100%) per centum of the face value of the bond so redeemed plus in each case accrued interest to the date of redemption, upon thirty (30) days notice in writing in accordance with the terms and conditions set forth in said deed of trust, to which deed of trust reference is hereby made for a more particular description of such terms and conditions; the bond or bonds so redeemed shall be the last maturing bonds.

"At any one time or from time to time on or after November 1, 1950, on any interest date any or all of the bonds of this issue may at the option of THE COMPANY be redeemed prior to maturity at one hundred (100%) per centum of the face value of the bond or bonds so redeemed plus a premium of ten (10%) per centum of the face value of the bond or bonds so redeemed on or prior to November 1, 1951, which premium shall be reduced by one (1%) per centum per annum each year thereafter to and including November 1, 1955 so that said premium is five (5%) per centum of the face value of the bond or bonds so redeemed after November 1, 1955, after which date any or all of said bonds may be redeemed at a premium of five (5%) per centum of the face value of the bond or bonds so redeemed plus in each case accrued interest to the date of redemption, upon thirty (30) days notice in writing in accordance with the terms and conditions set forth in said deed of trust to which deed of trust reference is hereby made for a more particular description of such terms and conditions; the bond or bonds so redeemed shall be the last maturing bonds. In the event of a release of any of the properties from the lien of said deed of trust as therein provided, the release price shall be forthwith applied to redeem, upon at least five (5) days written notice, the last maturing bonds (*i.e.* bond numbered 50, then 49, etc.) so that they are redeemed in inverse numerical sequence, at one hundred (100%) per centum of the face value of the bond or bonds so redeemed, plus in each case a premium of five (5%) per centum, plus accrued interest to the date of redemption in accordance with the terms and conditions set forth in said deed of trust, to which deed of trust reference is hereby made for a more particular description of such terms and conditions."

Article II, sec. 2 of the deed of trust reads:

"At any time, without notice, in case of involuntary liquidation of THE COMPANY, the entire amount of said bonds which are then outstanding shall at once become due and payable at par value."

Plaintiff is referred to in the deed of trust as "THE COMPANY."

Article X of the deed of trust provides:

"The following specific acts shall be deemed a default for the purpose of this Article:

. . .

"(f) Any default in the due observance or performance of any other covenant or condition hereof which is by the terms of this indenture expressly made obligatory upon THE COMPANY, after thirty (30) days notice thereof in writing to THE COMPANY."

In the event of a foreclosure sale the proceeds were distributable:

"SECOND: To the payment of the whole amount of the principal of the bonds issued hereunder, at that time unpaid and outstanding, and of the interest which shall then be owing and unpaid thereon, with interest on the principal of such bonds and on the overdue installments of interest, or, in case such proceeds shall be insufficient to pay in full the whole amount so due and unpaid on the said bonds, then to the payment of the principal and interest due on said bonds ratably, without preference or priority of principal over interest or interest over principal, or of any installment of interest over any other installment of interest."

Article IV entitled "General Covenants of the Company" provides in part:

"Section 7.—Maintenance of Net Working Capital.

"THE COMPANY covenants that it will at all times maintain net working capital (as generally classified by good accounting practice) of at least Seventy-five Thousand ($75,000.) Dollars.

"Section 8.—Restriction on Payment of Dividends.

"THE COMPANY covenants that it will not without the consent of the majority of the bondholders pay any cash dividends on any class of its capital stock or retire any of its capital stock, unless after such payment or retirement the earned surplus of the Company shall be not less than the sum of Two Hundred Thousand ($200,000.) Dollars." Section 8 was amended 16 May 1950 by adding at the end a provision that the Company would not, without the consent of the majority of the bondholders, pay any dividends on its capital stock or retire any stock, if after such payment or retirement the working capital of the Company would be less than $200,000.

Plaintiff, in June 1952, obtained a loan of $600,000 at 4½% interest. It used a part of the proceeds of this loan to pay the bonds held by defendant, the interest accrued thereon, and the premium of $25,120 demanded as a consideration for the payment of the bonds and cancellation of the deed of trust.

At the conclusion of plaintiff's evidence, the court sustained defendant's motion to nonsuit. Plaintiff appealed.

*Smith, Leach, Anderson & Dorsett for plaintiff appellant.*
*Arendell & Green and Charles G. Powell, Jr., for defendant appellee.*

RODMAN, J.   Plaintiff's assertion that the evidence supports its allegations that it was unlawfully forced to make the premium payment to save itself from great financial loss necessitates a review of the evidence.   The evidence is very largely documentary, consisting principally of the deed of trust and correspondence between the president of plaintiff and the assistant treasurer of defendant.

E. L. Farris, president of plaintiff and of Liberty, testified that in the fall of 1951 defendant made a complaint about the loan.   On 30 November 1951 Farris wrote M. H. Crocker, assistant treasurer of defendant, replying to a letter from Crocker dated 16 November.   In that letter Farris stated that plaintiff's operation had not shown the result hoped.   He attributed this to problems created by the Office of Price Stabilization.   On 5 December 1951 Crocker wrote Farris referring to a conversation had on 3 December.   Crocker's letter stated: "We feel that before we can reach a definite decision, we should have the following additional information:

"1. How do you justify payment of interest on the debentures of Liberty Baking Corporation by its subsidiary, Bell Bakeries Inc.?   We have noted the reason given by your auditors but that is an inadequate explanation."

The letter requested copies of operating and financial statements. On 10 December Farris replied and enclosed financial and operating statements through 24 November 1951.   These statements showed an excess of disbursements over receipts of $101,617.21 for forty-seven weeks, a loss incurred in the operation of seven of plaintiff's plants, but a net profit of $69,647.58 which was transferred to surplus; net working capital of $58,414.   In response to the inquiry as to payment of Liberty's obligations by Bell, the letter said: "You have requested also that we justify payment on interest of Liberty Baking Corporation debenture bonds by its subsidiary, Bell Bakeries, Inc.   Liberty Baking Corporation has no other source of income except through its subsidiary, Bell Bakeries, Inc., of which it, Liberty Baking Corporation, is the sole owner.   It has long been the considered opinion of management and our auditors that the operating company, Bell Bakeries, Inc., should be required to pay to Liberty Baking Corporation interest on its invested capital for use of operating facilities enjoyed by the subsidiary. It was therefore determined, at the time the Liberty Baking Corporation preferred stock was exchanged for Liberty Baking Corporation debenture bonds, that this expense would be an obligation of the operating company, Bell Bakeries, Inc. and this expense has been absorbed since 1948, at which time the debenture plan became operative.   We

therefore feel that this charge for interest expense against the subsidiary is justifiable and in order." On 19 December 1951 Crocker replied to Farris' letter of 5 December. He stated that the company's working capital on 10 March 1951 was $173,000; 19 May 1951 it had been reduced to $112,000; 23 June 1951 it had been reduced to $81,000. He then said: "Your working capital at November 24, 1951 amounted to $53,400, which is a violation of the Indenture requirement that it be maintained at $75,000.

"The dual violation of this contract justifies an immediate declaration of default and calling the issue. We are disposed to take that action unless you will assure us at once:

"1. That working capital has been restored to $75,000 or more.

"2. That your Company will enter into a supplemental indenture duly authorized by your directors and if necessary, your stockholders, providing among other things that Bell will pay no dividends on its stock, will make no interest or principal payments on its long-term debt other than the bonds of this issue, or that of Liberty Baking Corporation, and will make no disbursements to Liberty Baking Corporation, or loans or advances to any person, firm or corporation except in the due course of business, unless after such payment or disbursement working capital amounts to $200,000 or more." On 27 December 1951 Farris acknowledged receipt of this letter and stated that working capital was then in excess of $75,000. He stated further: "Regarding the paragraph numbered 2 of your letter, it is our interpretation that interest and principal payments on the debentures of Liberty Baking Corporation are excepted from the $200,000. working capital requirement. With this understanding our Directors have authorized the making of a supplemental Indenture in substance as set forth by you." He further stated that he would exercise his best efforts to maintain a working capital in excess of $200,000 and expressed appreciation for cooperation which has been given by Jefferson.

On 28 December Crocker, by telegram, replied to Farris' letter of the 27th. The telegram read: "PARAGRAPH TWO MY LETTER DECEMBER 19 DOES NOT EXCEPT INTEREST OR PRINCIPAL PAYMENTS ON THE DEBENTURES OF LIBERTY BAKING CORPORATION FROM THE $200,000 WORKING CAPITAL REQUIREMENT." Farris testified that upon receipt of this telegram he discussed it with counsel for Bell Bakeries. Farris testified: "The wire from Jefferson Standard indicating that they had made an exception to their letter which threw an entirely different light on the interpretation or pertaining to the paying of interest to Liberty on the bonds, naturally it was the most serious thing that had confronted us in quite some time. We didn't see how we could fail to pay the interest on those bonds, and they had agreed in their letter originally to accept

it." Notwithstanding the insistence by Jefferson that Bell should not make any payments to Liberty except in the ordinary course of business, Bell, on 1 January 1952, paid the interest accrued on Liberty's debentures.

On 7 January Farris conferred in Greensboro with Crocker about the loan and the position of their respective companies. On 8 January 1952 Crocker wrote Farris. In that letter he said: "We construe payment by Bell Bakeries, Inc. of interest or principal on the obligations of Liberty Baking Corporation, owner of the common stock of Bell Bakeries, Inc., to be a dividend on that common stock. Any other payment from Bell to Liberty, except in the due course of business, would bear the same classification. Therefore, such payments violate the agreement of May 16, 1950 unless after they have been made Bell Bakeries, Inc. has net working capital of $200,000 or more.

"We do not intend to protest interest payments already made by Bell on the Debentures of Liberty, but we will not permit such payments in the future in violation of the Indenture of November 1, 1947 and the letter agreement of May 16, 1950. If your Company will not be able to abide by those restrictions, I suggest that you arrange to refinance and retire the bonds we own." The letters and telegrams quoted above are the evidence on which plaintiff relies to show that it acted under duress. Farris testified that after his conference in Greensboro on 7 January and receipt of the letter of 8 January he began to make arrangements to refinance the loan. Farris testified that on 2 April he went to Greensboro, expecting to see Mr. Crocker to discuss the preliminaries as to what would be required of Bell Bakeries in order to pay off the loan, that he indicated to Mr. Crocker that he felt the payment of the interest to date of retirement and the principal amount would be the amount required by the insurance company to which Crocker replied: ". . . he wasn't sure of that, that he would have to discuss the matter with his committee, and that he would give me an answer later." On 10 April 1952 Crocker wrote Farris: ". . . we will accept full payment of this loan at 105 and accrued interest at any time on or before August 1, 1952."

On 15 April 1952 counsel for Bell wrote counsel for defendant reciting the relationship between Liberty and Bell and stated that Liberty had no source of income except such payments as might be made by Bell, that Bell obligated itself to service Liberty's debentures on 1 January 1948, that: "The consideration for this was the large amount of money which Liberty Baking Corporation had already invested in Bell and for which it did not exact or receive any return except as stated." He stated that the amount necessary to meet Liberty's obligations on its debentures was $62,000 per year and that these payments had been made since 1948 without protest until December 1951. Speaking with

respect to the amendment of May 1950 to the deed of trust, the letter said: "As Bell had no intention of paying any dividends to its stock-holders unless its working capital was at least $200,000 we agreed to this request. It was not then stated by Mr. Crocker, and we did not have the faintest inkling, that this provision was intended to prevent the payment of the amount which had been paid for Bell to Liberty to service the Liberty indentures since January 1948. . . . As we have no intention of bringing about a default in the Liberty Baking Corporation debenture issue, and as the management would expose itself to severe criticism if not legal liability for such action, we are endeavoring to follow Mr. Crocker's demand to replace the loan although we deny any violation of any provision of the indenture by our action. We have sought to make arrangements to refinance the loan and we are confident that we can effect such an arrangement were it not for the fact that in his letter of April 10, 1952, Mr. Crocker informs us that Jefferson will insist on a premium of 5% in payment of the balance of this loan."

The response to this letter is not in the record, but on 29 May 1952 counsel for Bell wrote Crocker disagreeing with the position taken by defendant that payments by Bell to Liberty violated the provision of the deed of trust as amended in May 1950. He said: "Under the cir-cumstances Bell has no alternative except to protest your position and pay the five point premium in order to avoid the irreparable damage set forth in my letter of April 15th." It was stated that Bell had arranged a loan and would pay Jefferson on 16 June.

Plaintiff obtained a loan of $600,000 and paid the debt owing defend-ant plus the premium of $25,120. It incurred expenses in excess of $25,000 in connection with the new loan.

The positions of the respective parties, as shown by the foregoing lengthy narration, may be summarized thus: Defendant was plaintiff's secured creditor. Plaintiff, debtor, had admittedly breached some of the terms of the trust. Defendant insisted that other acts of plaintiff constituted violations of the terms of the trust. It expressly waived all past violations but notified plaintiff that it would insist on com-pliance in the future. There is no evidence or suggestion that defendant was not acting in good faith for the protection of the debt owing to it. The deed of trust fixed the terms on which it could be discharged before the maturity of the debt.

Plaintiff was unable to comply with the terms of its mortgage and also pay the debt of its parent corporation which it had voluntarily assumed. It said to its secured creditor that it did not deem the pay-ments to be made on the debt of Liberty a violation of the trust agree-ment, but it was not willing to test its position in court. Confronted with a choice of complying with the covenants of its deed of trust or

the prepayment of its bonds at the price fixed in the trust, it chose the latter course. It says that it was forced by business necessities to the path it pursued, that the premium paid was not voluntary but under duress.

We are of the opinion that plaintiff has failed to establish the duress alleged and is therefore not entitled to recover.

Since money, like other commodities, is for hire, we may safely assume that the parties had extensive negotiations with respect to the terms each deemed important before agreeing upon the terms of the loan of November 1947. Plaintiff naturally sought terms which it regarded as important, such as rental or interest rate, length of loan, prepayment privileges, if it should no longer need the money or could hire other money on more advantageous terms. Defendant, charged with responsibility of hiring out the money of its policyholders, would naturally seek such things as safety of investment, a high yield consistent with safety of investment, and having satisfied itself as to these conditions, it would wish the hiring to continue for a relatively long time.

The law prescribes the maximum rate which can be charged for the use of money, G.S. 24-1. The parties were at liberty to contract for the loan on any terms not in conflict with the statute. The deed of trust and notes fixed the rate of return at 5%. Principal and interest were payable quarterly. The loan could run twelve and one-half years or plaintiff, at its option, and without extra cost to it, could, beginning in November 1950, pay two notes on each payment date, thus reducing the time the loan would run to approximately seven and one-half years. These additional payments could be made on only 30 days' notice to the creditor. This provision enabled plaintiff to shorten the time of hiring if it did not need the money or if interest rates should decrease and it could obtain the money at a cheaper rate.

Further provision was made by which plaintiff could, whenever advantageous to it, pay the loan. This privilege could only be exercised by compensating defendant for the trouble it would incur and the loss it would probably sustain because of lower interest rates. The amount of premium to be paid was dependent on the length of time plaintiff had used the money, varying from 10% to 5%; the longer the use, the lower the premium. This provision was legal and plaintiff could not elect to repay the entire loan without complying with this provision. *Smithwick v. Whitley*, 152 N.C. 366, 67 S.E. 914; *French v. Mortgage Guarantee Co.*, 104 P. 2d 655, 130 A.L.R. 67 (Cal.) ; 55 Am. Jur. 359.

A loan to a company with adequate reserves and working capital is of course to be preferred to one to a company without such reserves or losing money. The provisions of the deed of trust inserted for the protection of the lender that borrower should maintain a minimum working

capital and should not pay dividends or retire stock when borrower's financial condition did not meet the minimum requirements were valid.

The insertion in the deed of trust of the provision prohibiting the payment of dividends when working capital was below a fixed sum was intended to assure the ability of plaintiff to continue in business and hence to strengthen the security held by defendant. "The word 'dividend' denotes a fund set apart by a corporation out of its profits, to be apportioned among shareholders." *Trust Co. v. Mason*, 151 N.C. 264, 65 S.E. 1015. The only claim which Liberty had on the assets of Bell was stock ownership. It did not claim to be a creditor. The moneys paid it by Bell were not asserted to be loans but were paid solely because of stock ownership and the need of the stockholder for funds. Hence it would seem that these payments met the definition of dividends as used in the deed of trust. As said in *U. S. v. E. Regensburg & Sons*, 124 F. Supp. 687: ". . . in a closely held family corporation dividends may be distributed with considerable informality and not be denominated as such in the corporate documents." That these disbursements by Bell to Liberty met the definition of dividend is in conformity with numerous decisions. *Peoples Gin Co. v. Commissioner of Int. Rev.*, 118 F. 2d 72; *Mid-west Rubber Reclaim. Co. v. Commissioner Int. Rev.*, 131 F. 2d 157; *Helvering v. Gordon*, 87 F. 2d 663; *Angelus Building & Investment Co. v. Com'r. of Int. Rev.*, 57 F. 2d 130. The officers and directors of Liberty and Bell were the same.

Even if these payments did not meet the strict definition of a dividend, there was such close analogy that it cannot be said that defendant was not justified in so asserting.

The creditor had a legal right to insist that its debtor should comply with the contract. It had a right to call the debtor's attention to the terms of the contract and to inform it that upon failure to comply creditor would exercise its legal contractual rights. If, in these circumstances, the debtor declines to comply with the contractual provisions inserted for the protection of creditor but exercises his optional rights under the contract, he is not acting under duress. "Duress exists where one, by the unlawful act of another, is induced to make a contract or perform or forego some act under circumstances which deprive him of the exercise of free will." *Smithwick v. Whitley*, 152 N.C. 369, 67 S.E. 913; *Boyles v. Insurance Co.*, 209 N.C. 556, 183 S.E. 721.

"A threat to do what one has a legal right to do cannot constitute duress." *Kirby v. Reynolds*, 212 N.C. 271, 193 S.E. 412. Illegality is the foundation on which a claim of coercion or duress must exist. Hence a threat to exercise a power of sale in a mortgage when such right exists and to compel compliance with the terms of the mortgage does not constitute duress. *Bank v. Smith*, 193 N.C. 141, 136 S.E. 358; *Luff v. Levey*, 203 N.C. 242, 165 S.E. 703; *Gunter v. Thomas*, 36 N.C.

199; *Starks v. Field,* 89 P. 2d 513 (Wash.); *Weiner v. Minor,* 197 A. 691 (Conn.); *Walvoord v. Keystone Mortgage Co.,* 140 S.W. 2d 307 (Tex.); *Ochiuto v. Prudential Ins. Co.,* 52 A. 2d 228 (Pa.); *Inland Empire Refineries v. Jones,* 206 P. 2d 519 (Idaho); *Wise v. Midtown Motors,* 42 N.W. 2d 404, 20 A.L.R. 2d 735 (Minn.); *Stott Realty Co. v. Detroit Sav. Bank,* 264 N.W. 297 (Mich.); *Boyles v. Insurance Co., supra; Carey v. Fitzpatrick,* 17 N.E. 2d 882; 17 C.J.S. 532, 13 C.J. 399, 70 C.J.S. 358.

Defendant was acting within its legal rights in insisting upon a compliance with the terms of the deed of trust as fairly interpreted by it. A breach by plaintiff of the covenants made by it for the protection of defendant did not give it any rights or advantage which it could not have asserted if it had complied with the provisions of the deed of trust.

Had defendant in January declared a default and demanded payment, it would only have been entitled to collect the debt and interest accrued thereon to the date of payment. Such is the holding in *Kilpatrick v. Germania Life Ins. Co.,* 75 N.E. 1124; *Union Cen. Life Ins. Co. v. Erwin,* 145 P. 1125, and *Steffen v. Refrigeration Discount Corporation,* 205 P. 2d 727, cited and relied upon by plaintiff. These decisions conform to our own holding in *Moore v. Cameron,* 93 N.C. 51.

Here no default had been declared. Past defaults were expressly waived. Defendant did not elect to terminate the loan. The distinction between the cases cited and relied upon by appellant and this case is pointed out in *Hamilton v. Kentucky Title Savings Bank & Trust Co.,* 167 S.W. 898.

Plaintiff was put on notice that it must in the future comply with its contract or meet a default. It had a right to comply and continue with the loan. With the right to comply or pay the debt in accordance with the terms of the mortgage, it deliberately chose to pay. Since the evidence fails to disclose that defendant was guilty of illegal conduct or acted in bad faith for the purpose of oppressing plaintiff, appellant has failed to establish duress, coercion, or business compulsion creating any liability on the part of the defendant. The judgment is

Affirmed.

WINBORNE, C. J., took no part in the consideration or decision of this case.

JOHNSON, J., not sitting.