ANGELUS BUILDING & INVESTMENT CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 27089, 32736. Promulgated September 5, 1930.

*Alex W. David, Esq.*, for the petitioner.
*James L. Backstrom, Esq.*, for the respondent.

672

OPINION.

VAN FOSSAN: The sole issue in these proceedings is whether the amounts of $31,242.78 and $10,919 paid by the petitioner in the years 1922 and 1923, respectively, represented interest paid on loans or

dividends paid on capital stock. If the former position is correct, it follows that the recipients of such payments, the J. H. Braly trustees and A. H. Braly, were creditors of the petitioner corporation, and not its stockholders. Consequently, such amounts would be deductible from the gross income of the petitioner.

The petitioner was a close corporation whose stock was originally owned and controlled jointly by A. H. Braly and his brother-in-law, Herman Janss. It was incorporated for the purpose of carrying on the business of those two individuals. During the war period the real estate business became much depressed and the petitioner found it necessary to borrow money in order to pay its current obligations. Funds for that purpose were provided by J. H. Braly, the father of A. H. Braly, and by A. H. Braly himself. Considerable sums were secured from these sources and were termed advances or loans. They were so designated on the books of the petitioner and the amounts paid for the use of such sums were entered as interest. These transactions remained in that status in December, 1919, when the petitioner, through its controlling stockholders, A. H. Braly and Herman Janss, decided to place the money so advanced on a regular revenue-producing basis in order to provide for the requirements of J. H. Braly. Consequently, the petitioner issued to A. H. Braly, Emma Braly Janss, and H. H. Braly, as trustees for J. H. Braly, and to A. H. Braly, individually, certain shares of stock in the amounts equivalent to the loans or advances then existing on the books of the petitioner in favor of J. H. Braly and A. H. Braly. At the same time the petitioner issued to Herman Janss and A. H. Braly, each, 35,000 shares of stock representing a prior purchase made by the petitioner from the Braly-Janss Investment Co., whose stock was owned equally by A. H. Braly and Janss. Later, additional advances were made by the J. H. Braly trustees and A. H. Braly and corresponding stock was issued to them in amounts equivalent to such advances.

The first point we must consider is the contention of the petitioner that the issues of stock so described were made contrary to the provisions of the laws of California, in that no permit therefor was granted by the corporation commissioner, and that certain capital stock of the corporation was retired or issued as " treasury stock," without due regard for the requirements of the laws of that State. Assuming it to be a fact that the stock issue was without legal sanction, it comes with bad grace from the petitioner to seek in these proceedings the benefits of its confessed wrongdoing under its own State laws. Laws of that character are established for the protection of the stock-buying public. If the petitioner and its stockholders violated the laws of California, that is a matter between them and

the officials of that State. This fact is not controlling here. We may look upon the stock exactly as the record shows it was issued—the regular and authorized common stock of the petitioner corporation of the par value of $1 per share.

The form of the capital stock in controversy was not submitted to us. We may assume that the certificates, therefore, were of the usual character and contained the customary provisions. The main contention of the petitioner is based upon the agreements entered into between it and the stockholders by which the shares of common stock issued "to represent loans" were informally constituted a sort of preferred stock. The petitioner maintains that it was its purpose and the purpose of its stockholders to establish a more convenient arrangement for the payment of interest to J. H. Braly and A. H. Braly and to give them some security for their personal loans. The petitioner further contends that the continuation of its custom of entering on its books payments to the J. H. Braly trustees and A. H. Braly as "interest" and its inclusion of the stock transactions in its loan accounts established the status of the stock so issued as loans rather than capital stock.

It is fundamental that the stock in controversy can not be both capital stock and loans. Their holders must be either stockholders or creditors. They can not be both. *Bolinger-Franklin Lumber Co.*, 7 B. T. A. 402. The petitioner claims that the stock was an evidence of indebtedness. It could be so only by virtue of a collateral agreement, since it is obvious that holders of only one class of stock authorized to be issued necessarily must be stockholders of a corporation in the absence of any agreement or stipulation changing their status. If the only purpose was to evidence and secure the indebtedness, corporate notes or bonds would better have served the purpose. *Leasehold Realty Co.*, 3 B. T. A. 1129.

In reaching a conclusion, agreements filed as exhibits in these proceedings must be carefully scrutinized. The agreement between the petitioner and stockholders dated January 18, 1920, states that the corporation has "sold, transferred and delivered" certain certificates of its corporate stock. It further provides that the purchasers will "resell and deliver" the said certificates of stock under certain conditions. There appears nothing in the agreement which indicates that such stock shall be deemed collateral security for a loan or shall constitute a loan in itself. In fact, in the agreement between Braly and the J. H. Braly trustees, bearing the same date, appears the statement that the agreement just referred to provides for the acceptance by the said trustees of "certain capital stock, amounting to 218,000 shares, *in lieu of* certain indebtedness owing to said second

parties (the said trustees) by said first party (the petitioner)." This recital indicates clearly that it was the intention of the parties to the agreement of January 18, 1920, that the issuance and delivery of the capital stock of the petitioner was an exchange for, or in consideration of, the loans or advances made by the individuals to the petitioner corporation, and terminated the loan status.

The agreement of April 1, 1922, is perhaps a more significant document. It was entered into during the taxable year in which the petitioner claims its so-called interest payments as deductions, under Docket No. 27089. It was executed after the year in which the petitioner had reported as a part of its invested capital the capital stock issued under conditions similar to those existing on the date of the agreement. It was not executed by the petitioner corporation, but does bear the signatures of all the stockholders thereof. Consequently, it may be considered to reflect properly the intention and understanding of all the stockholders and hence the corporation itself. The agreement recites that 289,650 shares of capital stock were issued to the J. H. Braly trustees and 127,184 shares were issued to A. H. Braly (including the 230,000 shares and 95,000 shares issued to the J. H. Braly trustees and A. H. Braly, respectively, on December 31, 1919), under the express understanding that such stock might be received, redeemed or repurchased by the corporation upon payment of $1 per share (the par value) plus an amount equal to 7 per cent interest per annum and "*that the holders of said stock should have no further or other interest in or to the assets or profits of said corporation.*" The agreement states that all stockholders had adjusted all interest due on such stock and desired to continue their previous arrangement. Thereupon the parties agreed that no additional capital stock should be issued and that the stockholders would not transfer their stock without the consent of all the other stockholders.

The agreement further provides that the 289,650 shares of stock held by the J. H. Braly trustees and the 127,184 shares of stock held by A. H. Braly "shall be considered by the parties hereto as preferred stock and *shall be guaranteed dividends* in an amount equal to 7 per cent per annum, compounded quarterly, figured from the first day of January, 1922, and that said stock shall not participate in any other of the profits of said corporation." The agreement then establishes a method by which the corporation may retire, redeem or repurchase, at its own election, the capital stock so mentioned. The corporation may pay par value of such stock "plus dividends equal to 7 per cent interest per annum" and upon such payment the stockholder shall not have any further right, title, interest or equity in and to the assets of the said corporation. The

agreement further sets forth that the stockholders have adjusted among themselves all equities, profits and interests on the above stock up to and including December 31, 1921, and agree that they have no interest in or to the cumulative profits of said corporation or to any accruing profits except as such may be held intact as a guaranty for the payment of the par value of the stock, together with the accruing interest from and after January 1, 1922.

The terms employed in this agreement are significant and clearly indicate that the J. H. Braly trustees and A. H. Braly possessed the rights of common stockholders as modified by the voluntary agreement of all stockholders transforming their common stock into a species of preferred stock. The use of the word "dividend" is persuasive that the stockholders recognize the fact that the common stock received by them in the liquidation of their loans made to the petitioner had been transformed into a preferred stock having the usual attributes of such a security. The provisions relating to the retirement of the preferred stock are not uncommon and do not convert such stock into a debt against the corporation. The fact that no dividends were formally declared is immaterial, since the corporation was a family affair and the status of the "security" was established by a special agreement among its stockholders. The same reason may be advanced to explain why J. H. Braly, the father, took no interest in the affairs of the corporation. By virtue of their stockholding the J. H. Braly trustees possessed all the rights and potential interests of stockholders in the corporation and could have exercised them if they had so desired. The fact that the payments made on the stock were referred to in the books of the corporation or considered by the stockholders as "interest" is likewise immaterial. The terminology of the company's bookkeeper is not determinative of the legal character of the accounts. *McCoy-Garton Realty Co.*, 14 B. T. A. 853; *Smith* v. *Southern Foundry Co.*, 179 S. W. 205; *Armstrong* v. *Union Trust & Savings Bank*, 248 Fed. 268. Moreover, the agreement did not provide for the payment of dividends or interest unless the profits of the corporation should be sufficient to warrant their payment.

It is noted further that the corporation paid dividends to Herman Janss and A. H. Braly on the shares of stock which admittedly did not represent loans. Though obviously dividends, these payments also were termed "interest" on the books of the corporation. This fact is persuasive and militates strongly against the contention of petitioner.

In *Kentucky River Coal Corporation*, 3 B. T. A. 644, we held that the name which had been given to stock was not a thing to be ignored, " for it is not lightly to be assumed that parties have given an erroneous name to their transaction." The petitioner and its

stockholders have called the shares of capital stock in controversy preferred shares. We are of the opinion that they were correct in that designation and consequently are not entitled to deduct as interest from their gross income the amount paid as dividends on the said shares of stock.

*Decision will be entered for the respondent.*