Estate of William P. Cooper, Deceased, Daisy H. Cooper, Executrix v. Commissioner.
Estate of Cooper v. Commissioner
Docket No. 64788.
United States Tax Court
T.C. Memo 1960-98; 1960 Tax Ct. Memo LEXIS 192; 19 T.C.M. (CCH) 521; T.C.M. (RIA) 60098; May 18, 1960
*192 1. On or about December 1944, William P. Cooper purchased prepaid installment share accounts of the Perpetual Building and Loan Association in the amount of $2,273.26, which he held until his demise on December 28, 1948. During the years said share accounts were in existence (held almost exclusively by members of the Cooper family), Perpetual credited dividends thereto at various times in amounts ranging from 200 to 600 per cent representing a portion of its earnings. The current dividend on other types of share accounts issued by Perpetual during the same period was four per cent. Under Perpetual's bylaws dividends could not be paid to the holder until the share account matured or until the account was surrendered in its entirety to Perpetual for repurchase and withdrawal. Under the terms of his will, decedent bequeathed all of said shares to his wife, executrix and sole legatee, of his estate. On February 17, 1949, the executrix withdrew the balance of $117,445.65 from his share account with Perpetual, of which $115,172.39 represented dividend credits made to the accounts during its existence. On the same day, the executrix and Perpetual executed an escrow agreement which provided, *193 in essence, that the dividend credits in question be paid to an escrow agent, Mutual Savings and Loan Company (controlled by the Cooper family) on condition that if said dividends were not subject to income tax to the recipient but were subject only to estate tax, the dividends would be paid to decedent's spouse, and that if the dividends were subject to income tax, then they would be returned to Perpetual. At the time of the instant proceeding (about 10 years after said escrow agreement was executed) the funds were still held by the escrow agent. Held: That the escrow agreement was a sham and a tax avoidance device; that the dividends credited to William's share account during the years of its existence represented a portion of Perpetual's earnings to which his account was entitled as dividends upon surrender of the share account in its entirety and, hence, taxable as ordinary income of his estate under sections 161 and 126(a) of the Code of 1939. Held, further, that the provisions of section 113(a)(5) with respect to the basis of property do not apply to the dividends in question. 2. Petitioner failed to file a Federal income tax return for the taxable year 1949. Held, That since *194 no evidence was produced by petitioner showing the cause of such failure, addition to tax under section 291(a) was properly imposed. Charles F. Cooper, Esq., 4813 Forest Drive, Columbia, S.C., for the petitioner. George W. Calvert, Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: Respondent determined deficiencies in petitioner's income tax and additions to tax under section 291(a) of the 1939 Code for the taxable year 1949 in the amounts of $70,634.70 and $17,658.68, respectively. The issues presented are: (1) whether petitioner received taxable dividend income in the taxable year 1949 upon the withdrawal of the balance in prepaid installment share accounts of William P. Cooper, deceased, with Perpetual Building and Loan Association of Columbia; and (2) whether petitioner is liable for the additions to tax under section 291(a) of the *196 1939 Code for the taxable year 1949. Findings of Fact Some of the facts have been stipulated and, together with exhibits, are incorporated herein by reference. William P. Cooper died testate on December 28, 1948, a resident of Columbia, South Carolina. William was the husband of Daisy H. Cooper and the father of Charles, James, and Frank Cooper. Daisy H. Cooper was executrix under the will of William P. Cooper, deceased. William left all of his property to his wife, Daisy. The Estate of William P. Cooper, deceased, Daisy H. Cooper, Executrix, hereinafter called petitioner, did not file a Federal income tax return (Form 1040), or a Federal fiduciary income tax return (Form 1041) for the taxable year ended December 31, 1949. During all or part of the years 1944 to 1948, William P. Cooper (and James, Frank, Charles, and Virginia Cooper) held Prepaid Installment Share accounts with Perpetual Building and Loan Association of Columbia (hereinafter sometimes called Perpetual). Perpetual had been chartered under the laws of the State of South Carolina on May 30, 1914. From June 1945 through the year 1951, the following individuals served as officers and directors of Perpetual: *197 Charles F. Cooper
President
Frank B. Cooper
Vice President
James D. Cooper
Treasurer
Rosa M. Romanstine
Secretary Charles was in charge of Perpetual's operations. The above individuals were elected to the stated positions each year without opposition at meetings which were mainly attended only by the officers themselves. Virginia Cooper was Charles' wife. Perpetual's offices were with or adjacent to those of Biltmore Homes, Inc., Cooper Agency, and Mutual Savings and Loan Company (hereinafter sometimes called Mutual), all of which corporations were managed and dominated by members of the Cooper family. On December 30, 1944, Perpetual amended its bylaws to provide that the bylaws could be altered or amended by a vote of a majority of the directors at any regular or special meeting of the board of directors. Prior thereto the bylaws could be changed only by a vote of the majority of the whole number of shares represented at a regular meeting, or at a special meeting, called for that purpose. Perpetual also provided that all resolutions of its directors, passed at any meeting concerning matters provided in the bylaws would supersede the provisions of any *198 bylaws that were inconsistent therewith, and that the resolutions would automatically constitute amendments to the bylaws. During the years 1945 to 1951, inclusive, Perpetual was authorized to issue Fully Paid shares, Optional-Payment shares, Installment Loan shares, Prepaid Loan shares, and Prepaid Installment shares. Prepaid Installment shares could either be "Investment" or "Capital" Prepaid Installment shares. Perpetual did not issue stock certificates. All share accounts were represented by share account books (passbooks) containing a certificate of membership and evidencing the participation value of the account with the exception of Fully Paid share accounts which could be represented by a separate membership certificate. Each account had an ultimate maturity value towards which the holder made payments. Said share accounts did not require the member or holder to pay a definite amount each month, but allowed the member to make payments as he saw fit. Section 1(e), Article III of Perpetual's bylaws reads as follows: "(e) Prepaid Installment Shares, which shall be those shares on which the member has paid an initial payment of at least ten (10%) per cent of the total *199 par value of a designated number of shares to be purchased; and on which subsequent installments shall be payable at the option of the member; and on which share account all dividends, as and when declared, must be credited to the share account, until the full par value of the number of shares designated to be purchased has been paid, and the shares are thereby matured; and no dividends on such share accounts shall be payable before maturity, unless all such shares of the member, including all payments, dividends, and credits thereon, are surrendered and tendered to the Association for repurchase; provided that, after the initial payment and before maturity, redemption, or repurchase of the share account by the Association, all such shares thus designated to be purchased shall be reserved for the account of such member, and such member shall have a continuing option to pay the balance due on said shares and have Fully-Paid Shares issued therefor." Perpetual's share accounts were transferable only on its books and then only upon proper application of the transferee and the acceptance of the transferee as a member upon terms approved by its board of directors. By resolution adopted *200 on December 30, 1944, Perpetual provided for Investment Prepaid Installment shares and Capital Prepaid Installment shares. This resolution provides, in part, as follows: "BE IT RESOLVED, that Prepaid Installment Shares, as defined and authorized under Article III, Section (e), of the bylaws of the Association, may at any time hereafter, in the discretion of the Directors, be issued pursuant to subscription therefore in any Series of Shares, and designated by the Directors, in their discretion, at the time of subscription or issuance, in either of two ways and placed in either of two categories, as follows: (1) 'Investment' Prepaid Installment Shares may be issued pursuant to any subscription therefor approved by the Directors, in those cases where the initial payment on such shares is made in money or other thing of certain value in the judgment of the Directors. Such 'Investment' Prepaid Installment Shares shall be eligible from issue for credit with all regular, semi-annual dividends declared by the Directors, at all the same times, and to the same extent in every case, as other types of shares authorized or outstanding in the same Series and eligible for such dividends. "(2) *201 'Capital' Prepaid Installment Shares may be issued, pursuant to any subscription therefor approved by the Directors, in any case where the subscriber so requests, or where the initial or subsequent credits on such prepaid installment share account are, or will be, allowed by the Directors in exchange for services or properties of any kind or nature which the Directors consider to be of uncertain, contingent, or indeterminate value at the time of the subscription or issuance of said shares or credits on account thereof." Capital Prepaid Installment shares could not be redeemed or withdrawn by the holder until Perpetual had realized or became reasonably assured of realizing the value of all credits allowed for the property. Until the directors made a finding to that effect, the Capital prepaid installment shares were also not eligible for and did not receive any dividends. However, after the directors made such a finding, the Capital shares became eligible for dividends. After all other shares had received their regular semi-annual dividends, Perpetual credited so-called "stock" dividends to the Capital Prepaid Installment shares in amount determined by its directors on the basis of *202 accumulated surplus, reserves, and undivided profits then existing. The holder of a Capital Prepaid Installment account receiving such a "stock" dividend had the option of having the amount credited to his existing account thereby increasing its value or using the amount toward procuring additional accounts. On December 30, 1944, Perpetual adopted a resolution providing that regular, semiannual dividends would be placed first to the credit of Optional Payment and Fully Paid shares, then to Investment Prepaid Installment shares at a fixed rate not exceeding four per cent per annum on a cumulative basis, and that this would be the extent of such shareholders' participation in the profits and surplus reserves of Perpetual. All reserves remaining thereafter were subject to allocation to outstanding Capital Prepaid Installment shares as "stock" dividends. In the event of liquidation or distribution of Perpetual's assets, all assets were to be first applied toward redemption and payment in full of all Optional Payment and Fully Paid shares, with accumulated dividends at said fixed rate, then of all Investment Prepaid Installment shares, with accumulated dividends at said fixed rate. *203 Any and all remaining assets were to be distributed in full to holders of outstanding Captial Prepaid Installment shares. In addition to cash, Perpetual would take real estate suitable for homes in payment for shares. Perpetual took the property at its appraised value. One of the reasons for Perpetual using Capital Prepaid Installment shares was to allow an individual who had turned property in for such shares to receive the full value of the property when it was later sold by Perpetual. Except for members of the Cooper family, there were very few individuals who were allowed to pay for their share subscriptions by means other than cash. During the year 1944, William P. Cooper made payments to a Prepaid Installment Share account in the aggregate amount of $2,273.26. On December 31, 1945, Perpetual authorized the creation and issuance of a new series of shares designated as Series 146. Perpetual accepted for the new series all of the assets, and assumed all of the liabilities of share accounts of Mutual, Series 63045. Perpetual also took over as its members and shareholders of Series 146, the members and shareholders of Mutual, Series 63045. Said share accounts included those *204 of J. Hughes Cooper estate, Charles F. Cooper, J. S. Cooper, and William P. Cooper. Also included with the Capital Prepaid Installment share account of William P. Cooper with a credit of $9,093.04 based on a so-called "stock" dividend of four shares for one, William having paid a total of $2,273.26 in cash into his Prepaid Installment share account in Perpetual (Series 145). On December 31, 1945, Perpetual authorized the creation and issuance of a new series designated as Series 145. For this new series, Perpetual accepted from Mutual, Series 145, at book value, certain assets, assumed the liabilities, and the share accounts were turned over accordingly by Mutual to Perpetual. The share accounts were as follows: Share Credits
Name
Type of Shares
Maturity Value
on 12-31-45
Frank B. Cooper
Inv. - PPI
$ 30,000
$ 3,000
Inv. - PPI
20,000
2,000
James D. Cooper
Inv. - PPI
30,000
3,000
Inv. - PPI
20,000
2,000
Charles F. Cooper
Inv. - PPI
30,000
3,000
Inv. - PPI
20,000
2,000
Cap. - PPI
110,000
11,000
Cap. - PPI
2,000
200
Virginia P. Cooper
Cap. - PPI
40,000
4,000
Cap. - PPI
8,000
800
On December 10, 1945, Charles *205 had purchased 67.64 acres of land from the F. S. Royster Guano Company for $25,000, part of which was borrowed from Perpetual. Charles transferred the property at cost to Perpetual, Series 145, on January 1, 1946, for which he was given share credits. Charles intended to transfer the property to Perpetual for share credits at the time he purchased it. On December 31, 1946, Perpetual approved new subscriptions for Capital Prepaid Installment shares, Series 145, by Frank B., James D., and Charles F. Cooper. Each was allowed to subscribe to such shares with maturity values not exceeding $100,000, divided into not more than 10 share accounts. Perpetual agreed to carry the required ten per cent intial payment for each of them as a "share loan," provided that the ten per cent be paid in full on or before December 20, 1947. Perpetual never did this for anyone else. Pursuant to this preferential treatment, Frank, James, and Charles, each subscribed to ten shares of said stock with a maturity value in the amounts of $90,000, $91,000, and $100,000, respectively. Each subscription was made on January 1, 1947, with the ten per cent initial payment being made on December 12, 1947. On June 30, 1946, Perpetual *206 declared a so-called "stock" dividend of two shares for one on Capital Prepaid Installment shares, Series 146. This included the share account of William P. Cooper which, after giving effect to the dividend, had a maturity value of $160,000, on which there was then a total credit of $18,186.08. On December 31, 1946, Perpetual declared a "stock" dividend of six shares for one share on all Capital Prepaid Installment shares. As a result of the December 31, 1946, "stock" dividend declaration, William's share accounts with Perpetual (having credit balances of $18,186.08) received additional dividend credits of $90,930.40. After this credit the account had a balance of $109,116.48. Likewise, as a result of the December 31, 1946, "stock" dividend declaration, Virginia's share accounts with Perpetual (having credit balances totaling $4,800) received dividend credits of $24,000. Virginia withdrew the balance of $24,725.40 from one of the accounts in 1948. Of said amount, $20,000 represented dividends credited to the account on December 31, 1946. On December 31, 1947, Perpetual declared a "stock" dividend of six shares for one share on all Capital Prepaid Installment shares. The accounts *207 acquired by Frank, James, and Charles, on January 1, 1947, were credited with the respective amounts of $45,000, $50,000, and $50,000. Five of the Capital Prepaid Installment share accounts of each brother were then converted to Investment Prepaid Installment share accounts. On October 18, 1948, Frank withdrew the balance of $18,000 in Prepaid Installment accounts of which amount $15,000 represented so-called "stock" dividends credited to the account on December 31, 1947. Likewise, on October 17, 1948, James withdrew the balance of $30,000 in Prepaid Installment accounts, of which amount $25,000 represented "stock" dividends credited to the account on December 31, 1947. The aforesaid dividends, credited to the installment share accounts of James, Frank, and Virginia, and which were withdrawn by them during 1948, were the same type of dividends credited to the share account of William P. Cooper. The current dividend on other types of share accounts during the period involved herein was four per cent per annum. The total maturity value of share accounts held by Charles, Virginia, Frank B., James D., and William P. Cooper was as high as $751,000 at times during the years 1945 *208 to 1951, inclusive. Under the terms of William's will, he bequeathed his installment share account to his wife, Daisy, who was executrix and sole legatee of his estate. Said share account was the only property listed in the official inventory of William's estate, and the appraisal value thereof at the time of his demise on December 28, 1948, was $117,445.65. On February 17, 1949, Perpetual "repurchased" said shares in full from William's estate for $117,445.65. Of the total amount received $115,172.39 represented dividend credits made to the account during its existence. Attached to a "Warrant of Appraisement Inventory and Return of Appraisers," filed on behalf of the executrix of William's estate in the Probate Court, County of Richmond, South Carolina, there is a document referred to as "Escrow Agreement" which reads, in part, as follows: "State of South Carolina County of Richland] Escrow Agreement "THIS AGREEMENT, made and entered into this 17th day of February, 1949, by and between Perpetual Building and Loan Association of Columbia, hereinafter referred to as the "Association," Daisy H. Cooper, as Executrix and sole Legatee and Devisee of the Estate of W. P. Cooper, *209 Sr., hereinafter referred to as the "Shareholder," and Mutual Savings and Loan Company, of Columbia, S.C., hereinafter referred to as the 'Escrow Agent,' WITNESSETH "WHEREAS, heretofore, on or about December 30, 1944, W. P. Cooper purchased certain 'Capital' Prepaid Installment Shares of the stock of the Association, in accordance with its corporate by-laws as amended, and paid therefor the sum of $2,273.26; and, whereas, said 'Capital' shares of stock were held by the said W. P. Cooper until his death on December 28, 1948, leaving a Will under the terms of which all of said shares of stock passed to his wife, Daisy H. Cooper; and, whereas, while said stock was held by the said W. P. Cooper, no regular semi-annual dividends were declared or paid by the Association on said 'Capital' stock, as was done by the Association in the case of regular Optional-Payment and Fully-Paid shares; but, pursuant to resolutions of the Directors of the Association, certain 'stock' dividends were declared on said 'Capital' shares of stock, and although no money or payment of any kind was received by said 'Capital' stockholder at any time while he held said stock, the 'book' value of said stock was increased *210 from time to time, by the Association's declaration of said 'stock' dividends thereon, so that at the time of said 'Capital' stockholder's death, the 'book' value of said 'Capital' stock was $117,445.65; and, whereas, if regular, semi-annual dividends had been credited by the Association on said stock of the said W. P. Cooper in the same manner and at the same rates as the same were declared and credited to the share accounts of the holders of Optional-Payment and Fully-Paid Sahes [Shaes] in said Association, without the application of any of said 'stock' dividends, the 'book' value of said shares of the said W. P. Cooper would now be $2,638.04; and, whereas, said Shareholder has now tendered said shares of stock to the Association for repurchase, and it is uncertain as to which of the above bases should properly be used in making said repurchase, and the difference involved is $114,807.61; NOW, THEREFORE: "IT IS AGREED that the said difference of $114,807.61 be, and the same is hereby, paid to the above named Escrow Agent to be held by it in trust and in escrow until the question involved is determined by the Courts, or otherwise if all parties agree, and then paid over, with *211 any interest or earnings thereon, to either the Association or the Shareholder, their respective successors, heirs, and assigns, upon the following conditions and contingencies, to wit: "(1) If it is determined that the building and loan shares in question were 'capital stock' of the corporate Association, on which no regular dividends or earnings were paid or payable, and which passed under the Will of W. P. Cooper to his wife, Daisy H. Cooper, at its actual value at the time of his death for purposes of Federal taxation, and if no income tax is legally due or payable on said $114,807.61, but only estate tax, under existing Federal tax laws, then the said amount shall be paid over by the Escrow Agent to Daisy H. Cooper, her heirs, assigns, donees, and designees; OR, "(2) If it is determined that the building and loan shares in question were subject to credit with only regular dividends of the Association in the same manner and semi-annually at the same rates as all other shares of the Association, and if the increase in value of said shares of stock, while the same were held by the said W. P. Cooper, would necessarily constitute taxable income under existing Federal tax laws, *212 then it is hereby agreed that this Shareholder would not be legally entitled to any more or higher rate of such earnings or dividends on the shares in question than holders of other shares in the Association; and, in such event, the said amount of $114,807.61 shall be paid over by the Escrow Agent to Perpetual Building and Loan Association of Columbia, its successors and assigns. "WITNESS the hands and seals of the parties hereto this 17th day of February, 1949. "PERPETUAL BUILDING AND LOAN ASSOCIATION OF COLUMBIA /s/ Chas. F. Cooper / President /s/ R. M. Romanstine / Secretary DAISY H. COOPER /s/ Daisy H. Cooper / Executrix and Shareholder" The Cooper brothers, James, Frank, and Charles, were corporate officers and "managing operators" of both Perpetual and Mutual. Opinion Issue I Respondent determined that petitioner realized taxable dividend income during the year 1949 in the amount of $115,172.39 upon the withdrawal of the balance in the prepaid installment share account of William P. Cooper, deceased, (in the total amount of $117,445.65) with Perpetual Building and Loan Association of Columbia by his wife as the executrix of his estate. Essentially, it is respondent's *213 position that dividend credits totaling $115,172.39, which were made to William's account during the years 1945 to 1948, inclusive, represented a portion of Perpetual's earnings to which William's share account was entitled as cash dividends, and, hence, taxable as ordinary income of his estate under sections 161 and 126(a) of the Code of 1939. [1]
*214 Petitioner, in opposition, contends that it did not receive, either actually or constructively, any dividends or other amounts constituting taxable income because the money paid by Perpetual to Mutual from William's share accounts was made pursuant to the terms of an escrow agreement which restricted petitioner's right to the money involved herein. Petitioner futher argues that under section 113(a)(5) [2] of the 1939 Code, the basis of the share accounts for tax purposes was their fair market value at Cooper's death and that there could be no taxable income or profit in 1949 since said accounts were repurchased by Perpetual for the same figure, and the proceeds have been retained in escrow as of the date of the instant proceeding. Our analysis of the facts and law leads us to agree with the determination of respondent. *215 At the outset we recognize that there is nothing reprehensible in casting one's transactions in such a fashion as to minimize the incidence of taxation. The courts have repeatedly reaffirmed this view. Gregory v. Helvering, 293 U.S. 465 (1935). On the other hand, a taxpayer, seeking to avoid taxation, may attempt to disguise a transaction and make it appear to be something which in reality it is not. In a proper case in which the courts are confronted with the latter type of problem, they will ignore the form the transaction has assumed, declaring it, in its entirety or in part, to lack genuineness or to be a sham, and will ascertain the tax impact based upon the actualities of the transaction. See Eli Goodstein, 30 T.C. 1178, 1190 (1958), affd. 267 F. 2d 127 (C.A. 1, 1959). And see, 1432 Broadway Corporation, 4 T.C. 1158, affd. per curiam 160 F. 2d 885 (C.A. 2, 1940), where, in discussing the bona fides of a transaction, we said: (p. 1164) "The debentures are in approved legal form, and, if their legal attributes alone were determinative of the character of the interest accruals, there would be little room for *216 doubt that they were the indebtedness they purport to be. [Citing] But, for tax purposes, their conformity to legal forms is not conclusive. Although a taxpayer has the right to cast his transactions in such form as he chooses, * * * the Government is not required to acquiesce in the taxpayer's election of form as necessarily indicating the character of the transaction upon which his tax is to be determined. 'The Government may look at actualities and upon determination that the form employed for doing business or carrying out the challenged tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute.' Higgins v. Smith, 308 U.S. 473. * * * The Government is not bound to recognize as the substance or character of a transaction a technically elegant arrangement which a lawyer's ingenuity has devised. * * *" In the instant case, we think it clear, upon the record, that petitioner through its executrix, was entitled, upon surrender of the share account in its entirety, to receive the total amount of the account, including all dividends credited thereto. It is also apparent that, the ownership of the share *217 account, upon the death of William, devolved upon his estate, and that, whatever procedural gaps were leaped, petitioner, through its executrix, did surrender the entire share account and constuctively received the entire amount credited to the account. At the same time, Perpetual, on its books, closed out the share account. The amount paid into the escrow account could only have devolved through the executrix. (There is no contention that the estate distributed the funds in the account to Daisy Cooper, individually). There was no legal impediment to the right of the estate to the proceeds of the account upon surrender of the account in its entirety. There was likewise no de facto impediment to the accomplishment of this result in view of the practical control of Perpetual by the Cooper family, some of whom had already surrendered their share accounts and received the full amount of the credits to their accounts. Only by agreement and consent of the executrix could the proceeds of the share account in question be paid into escrow. The terms and conditions of the escrow agreement were in no way binding upon the tax authorities with respect to the income tax obligation of the estate *218 arising by virtue of the dividend credits constructively received by the estate, and, as above indicated, as a matter of law, the proceeds of the share account were necessarily first channeled through the estate (whether all of the usual physical steps of transfer were carried out or not) before going into the escrow account. The escrow agreement itself fairly interpreted shows on its face that the sole purpose for its existence was to postpone or avoid income tax or both with respect to the dividend credits to the share account. We think it equally apparent that the effort to accomplish either or both of such purposes was a futile one. See George W. Drysdale, 32 T.C. 378 (1959); Williams v. United States, 219 F. 2d 523 (C.A. 5, 1955). Lending some color (if such be needed) to the fact that the transaction was not at arm's-length is the close relationship and lack of adverse interest of the several parties to the agreement, coupled with their practical control of the corporate entities involved. The parties to the alleged escrow agreement were (1) Perpetual, acting through its president and dominant figure, Charles F. Cooper, a son of William P. Cooper, *219 deceased, and Daisy H. Cooper; (2) Daisy, who was the mother of Charles, the wife of William, and the executrix and sole beneficiary of his estate; and (3) Mutual Savings and Loan Company, acting through its president, Walter A. Perry, who was the father-in-law of Charles. Under the circumstances, there was no reason for Daisy to have any concern as to whether the funds in the escrow account would be made available to her, in whole or in part, by some subsequent agreement of the parties if and when she desired it. During the year 1944, William P. Cooper made payments in his Prepaid Installment share account in the aggregate amount of $2,273.26. Thereafter, at various periods during the years 1945 through 1948, inclusive, Perpetual made substantial credits thereto, (as well as to the accounts of Virginia, Frank, James, and Charles) ranging from 200 to 600 per cent at a time, representing so-called "stock" dividends from Perpetual's earnings. As a result of these dividends, at the time of William's demise in 1948, he had total dividend credits of $115,172.39, although the actual amount paid in by him was only $2,273.26. Preferential treatment of this character was, in the main, limited *220 to members of the Cooper family. Dividends credited to William's account were the same in character as those that had been credited to the share accounts of Virginia, James, and Frank Cooper, and which had been withdrawn by them during 1948 in cash. Frank and James had withdrawn such credits in cash totaling $40,000 about four months prior to the escrow agreement involved herein. On February 17, 1949, Perpetual "repurchased in full" for cash the Prepaid share account of William in the amount of $117,445.65, and the accumulated dividends were on that date paid into escrow with Mutual purportedly pursuant to the terms of the escrow agreement. In the light of the foregoing considerations, we believe that the escrow arrangement was no more than the adoption of a convenient step by members of the Cooper family in an effort to postpone indefinitely the payment of all Federal income taxes by petitioner. The transaction served no bona fide business or investment purpose. No purpose for the escrow arrangement emerges in the record other than to escape taxation. Taxation may not be postponed indefinitely or avoided by neatly conceived legal arrangements with agreeable parties. Moreover, *221 as indicated supra, even if we held that the escrow agreement was bona fide, the estate would not escape taxation on the dividend credits since it first received them, in legal effect (constructively) before channeling them to the escrow agent. We next consider the question of whether the so-called "stock" dividends credited to William's share account ($115,172.39) were includible in income, and if so, for what year. It is our view that these credits represented dividends taxable as ordinary income and that they were taxable as such for the taxable year in which the account was surrendered in full and the proceeds withdrawn. It is clear that the amounts credited to William's share account were not taxable to him in the year the credits were entered, because Perpetual's bylaws prohibited these dividends from being paid to him until the account matured or until it was surrendered in its entirety. There was no constructive or actual receipt of the dividend income until the account was surrendered in full in 1949 by the executrix of William's estate and the dividends totaling $115,172.39 did not become subject to taxation until that time. Regs. 111, sec. 29.42-3; Estate of Bertha May Holmes, 1 T.C. 508 (1943). *222 Section 126(a), supra, provides that all items of gross income in respect of a decedent which are not properly includible in respect of the taxable period in which falls the date of his death or a prior period shall be included in the gross income for the taxable year in which his estate received it, if the right is acquired by the estate from him. The amount so includible by the estate is treated for tax purposes the same as it would have been treated if the decedent had lived and received the money himself. Section 126(a)(3), supra. United States v. Ellis, 264 F. 2d 325 (C.A. 2, 1959). Hence, the amount of $115,172.39 was plainly income in respect of the decedent which was includible in the taxable year of the estate when received (1949) upon the withdrawal from Perpetual, the right to receive it having been "acquired by the decedent's estate from the decedent" within the meaning of section 126(a)(1)(A), supra. See Estate of O'Daniel v. Commissioner, 173 F. 2d 966 (C.A. 2, 1949), affirming 10 T.C. 631 (1948). True, the decedent would not have had a legally enforceable right to receive said amount under Perpetual's bylaws until the account *223 matured or until it was surrendered in its entirety, but, as we have held, supra, the share account was surrendered by the estate in its entirety in the estate's taxable year 1949, and the account was closed in that taxable year by Perpetual. We find no merit in petitioner's argument that under section 113(a)(5), supra, no gain was realized by it in 1949 upon the withdrawal of the money in question from Perpetual on the theory that the basis of William's shares, including "stock" dividends, was the fair market value at the time of decedent's demise which fair market value was in this instance the same as the repurchase value thereof by Perpetual in the same year. Petitioner appears to have misconstrued section 113(a)(5), and has overlooked the exclusive provisions of section 126(a), supra, which govern the instant situation. For reasons to be discussed hereinafter, we hold that no part of the dividend credits in the amount of $115,172.39 represented "stock" dividends, as urged by petitioner. The basis of William's share account (and that of his estate, on acquiring it from William) was the "cost" to him at the time of acquisition and is deemed to have the same character as it would *224 have had if he had lived. ($2,273.26). The dividend credits in the hands of the estate are likewise deemed to have the same character which they would have had if William had lived, but were of a far different character than the $2,273.26 paid into the share account by William, since the dividend credits are gross income items while the cash paid into the share account is not. The legislative history of section 126, supra, and the correlative regulations make it clear that if this section is applicable to the facts involved herein, section 113(a)(5) is not. Section 29.126.1, regs. 111, states, in pertinent part, as follows: * * *
"Since section 126 provides for the treatment of such amounts as income to the estate and other persons placed in the same position as the decedent with respect to such amounts, the provisions of section 113(a)(5) with respect to the basis of property acquired by bequest, devise, or inheritance do not apply to these amounts in the hands of the estate and such persons. * * *" The language of the legislative background is substantially the same. H. Rept. No. 2333, 77th Cong., 2d sess. (1942), pp. 83-84; S. Rept. No. 1631, 77th Cong., 2d sess. (1942), *225 pp. 100-101. See also, Frances E. Latendresse, 26 T.C. 318, 326 (1956), affd. 243 F. 2d 577, 580, (C.A. 7, 1957); Estate of O'Daniel v. Commissioner, supra. We likewise reject petitioner's contention that only "stock" dividends were ever credited or made available to either William or his estate and, therefore, any gain realized from the credits to his account ($115,172.39) was nontaxable within the purview of section 115(f), [3] supra. A dividend which is taxed as ordinary income is defined as any distribution by a corporation to its shareholders out of earnings or profits. Section 115(a), supra. This rule applies to building and loan associations in the same manner as it does to other corporations. It is our view that the amounts in question had been *226 declared as regular dividends by Perpetual to its members or shareholders of the particular class out of its earnings or profits for the year William's account was in existence. The credits to his account did not represent a dividend of stock on stock, which is the nature of a stock dividend as commonly understood, but a crediting of the share account, subject to conditions and restrictions as to payment, but represented the member's pro rata share of the earnings of the building association. By surrendering the passbook and withdrawing the account in full, each member acquired the amount that had been credited to his account representing his initial payment, subsequent amounts paid in by him, and his share of the earnings or profits. Had it not been for the restriction on the right of each member to withdraw the amounts credited as "dividends," it is clear William would have been taxed at ordinary rates on such dividends when the credits were entered, and such amounts would not have been entitled to treatment as stock dividends. The fact that credits made on the shares were referred to in the books and records of the building association as "stock dividends" is immaterial. Book *227 entries or terminology in corporate records and bylaws, while of some evidentiary value, are not determinative. Angelus Building & Investment Co., 20 B.T.A. 667, 676 (1930), affd. 57 F. 2d 130 (C.A. 9, 1932), certiorari denied 286 U.S. 562. Whether the amounts credited to William's share account representing a share of Perpetual's earnings be called dividends, or by any other convenient term, it is clear that they represent ordinary income taxable as such, and not stock dividends or capital gains. See Aaron Ward & Sons, 23 B.T.A. 1279, 1281-1282 (1931), affd. 65 F. 2d 758 (C.A. 3, 1933); C. F. Mueller Co., 40 B.T.A. 195, 199 (1939). Issue II Respondent has added 25 per cent to the deficiency for the taxable year 1949 pursuant to section 291(a) of the 1939 Code on the ground that petitioner failed to make and file a Federal income tax return for the taxable year 1949 within the time prescribed by law. Said addition to the tax is applicable unless the taxpayer shows that the failure to file a return was due to reasonable cause and was not due to wilful neglect. D. L. Philippe, 26 T.C. 984, 992 (1956); *228 Robert A. Henningsen, 26 T.C. 528, 536, affd. 243 F. 2d 954 (C.A. 4, 1957). There is no dispute as to the failure of petitioner to file the aforesaid returns for the taxable year 1949. Since no evidence was produced by petitioner showing the cause of such failure, respondent's determination is sustained. Decision will be entered under Rule 50. Footnotes
1. SEC. 161. IMPOSITION OF TAX. (a) Application of Tax. - The taxes imposed by this chapter (other than the tax imposed by subchapter E relating to tax on self-employment income) upon individuals shall apply to the income of estates or of any kind of property held in trust, including - (1) Income accumulated in trust for the benefit of unborn or unascertained persons or persons with contingent interests, and income accumulated or held for future distribution under the terms of the will or trust; (2) Income which is to be distributed currently by the fiduciary to the beneficiaries, and income collected by a guardian of an infant which is to be held or distributed as the court may direct; (3) Income received by estates of deceased persons during the period of administration or settlement of the estate; and (4) Income which, in the discretion of the fiduciary, may be either distributed to the beneficiaries or accumulated. * * *
SEC. 126. INCOME IN RESPECT OF DECEDENTS. (a) Inclusion in Gross Income. - (1) General rule. - The amount of all items of gross income in respect of a decedent which are not properly includible in respect of the taxable period in which falls the date of his death or a prior period shall be included in the gross income, for the taxable year when received, of: (A) the estate of the decedent, if the right to receive the amount is acquired by the decedent's estate from the decedent; (B) the person who, by reason of the death of the decedent, acquires the right to receive the amount, if the right to receive the amount is not acquired by the decedent's estate from the decedent; or (C) the person who acquires from the decedent the right to receive the amount by bequest, devise, or inheritance, if the amount is received after a distribution by the decedent's estate of such right. * * *
(3) Character of income determined by reference to decedent. - The right, described in paragraph (1), to receive an amount shall be treated in the hands of the estate of the decedent or any person who acquired such right by reason of the death of the decedent, or by bequest, devise, or inheritance from the decedent, as if it had been acquired by the estate or such person in the transaction by which the decedent acquired such right; and the amount includible in gross income under paragraph (1) or (2) shall be considered in the hands of the estate or such person to have the character which it would have had in the hands of the decedent if the decedent had lived and received such amount.↩
2. SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS. (a) Basis (Unadjusted) of Property. - The basis of property shall be the cost of such property; except that - * * *
(5) Property transmitted at death. - If the property was acquired by bequest, devise, or inheritance, or by the decedent's estate from the decedent, the basis shall be the fair market value of such property at the time of such acquisition. * * *↩
3. SEC. 115. DISTRIBUTIONS BY CORPORATIONS. * * *
(F) Stock Dividends. - (1) General rule. - A distribution made by a corporation to its shareholders in its stock or in rights to acquire its stock shall not be treated as a dividend to the extent that it does not constitute income to the shareholder within the meaning of the Sixteenth Amendment to the Constitution. * * *↩