THEODORE O. WENTWORTH and SHIRLEY M. WENTWORTH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wentworth v. Commissioner
Docket No. 3913-71.
United States Tax Court
T.C. Memo 1973-199; 1973 Tax Ct. Memo LEXIS 89; 32 T.C.M. (CCH) 925; T.C.M. (RIA) 73199; September 10, 1973, Filed Bart A. Brown, Jr., J. Neal Gardner, and Conrad Magrish, for the petitioners. Juandell D. Glass, for the respondent. TIETJENS
MEMORANDUM FINDINGS OF FACT AND OPINION TIETJENS, Judge: The Commissioner determined deficiencies in petitioners' income tax as follows: 2 Year
Deficiency 1964
$145,695.49
1965
115,385.00
1966
2,523.00
Certain concessions have been made by both parties. The questions remaining for decision are: (1) Whether withdrawals by Theodore O. Wentworth (hereafter petitioner) from Chemical Processes of Ohio, Inc. (hereafter Chemical), a corporation controlled by him, in 1964 constituted dividends *90 or were bona fide loans; and (2) Whether the "purported" redemption of petitioner's stock in Chemical in 1965 resulted in taxable gain. FINDINGS OF FACT The stipulated facts are so found and are incorporated herein by this reference.
Issue 1 Petitioners Theodore O. Wentworth and Shirley M. Wentworth, husband and wife, resided in Northport, Michigan, for the calendar years 1964 and 1965 and in Cincinnati, Ohio, for the calendar year 1966 and at the time they filed their petition in this proceeding. They filed joint Federal income tax returns for the taxable years 1964 and 1965 with the district 3 director of internal revenue, Detroit, Michigan, and filed an original and amended joint Federal income tax return for the taxable year 1966 with the district director of internal revenue, Cincinnati, Ohio. Prior to April 1, 1964, petitioner owned one-third of the outstanding stock of Vulcan-Cincinnati, Inc. (hereafter Old Vulcan). The remaining two-thirds of the common stock of the company was owned by petitioner's two brothers. On April 1, 1964, Old Vulcan was divided into two corporations by means of a divisive reorganization. One of these was a manufacturing company, *91 of which petitioner's two brothers were the sole stockholders. The other (hereafter Vulcan) was an engineering company, of which petitioner and members of his immediate family were the only stockholders. Between July 1941 and April 1, 1964, petitioner made cash withdrawals from Old Vulcan, and these were recorded in Account 192E, "Due from Officers." The balance in this account on March 31, 1964, at the time of the reorganization, was $219,574.38. The Commissioner sought to treat petitioner's withdrawals in 1957, 1958, and 1959 as dividend income rather than loans, but this Court held that the amounts withdrawn constituted bona fide loans 4 from Old Vulcan to petitioner. Theodore O. Wentworth, T.C. Memo. 1966-167. Chemical, which engaged in the business of developing and licensing chemical processes, was incorporated as Chemical Processes, Inc., under the laws of the State of Ohio on October 31, 1958. As of January 1, 1964, Chemical had 55 shares of common stock outstanding, of which petitioner owned 52.5 shares and Paul W. Steer (hereafter Steer) owned 2.5 shares. On December 31, 1964, Checmial issued 3,025 shares of preferred stock, $100 par value, as a *92 nontaxable stock dividend. Petitioner received 2,886 of these shares, and Steer received 139 shares. From October 31, 1958, through January 12, 1966, petitioner served as a Director, the Chairman of the Board, and the President of Chemical. Steer served as a Director and the Secretary/Treasurer, and R. J. White served as a Director and the Vice President of the company. Chemical earned taxable income in the years 1962, 1963, and 1964 in the amounts of $17,043.10, $100,435.62, and $706,503.88 respectively. The earned taxable income in 1964 was due largely to the gain recognized on the sale of a urea 5 process to Allied Chemical. On December 31, 1964, Chemical had earned surplus and undivided profits of $299,973.47 after reduction by $302,500 for the stock dividend declared on that date. During the period from January 1, 1964 through January 12, 1966, Chemical did not declare or pay cash dividends to its shareholders, and there is no evidence of any history of dividend payments. During 1964, petitioner withdrew funds from Chemical or caused Chemical to make payments in his behalf in a net amount of $210,440.72. These withdrawals were charged to Checmial Account 205, "Accounts *93 Payable - T. O. Wentworth," which was carried as a negative accounts payable but was, in effect, an open accounts receivable. The withdrawals were not charged to Chemical Account 110, the notes receivable account. Petitioner did not pay interest, and interest did not accrue, in connection with Account 205 during the period from January 1, 1964, through January 12, 1966. On January 12, 1966, Chemical was merged into Vulcan, and, in connection therewith, the books and records show that Chemical Processes Account 205, "Accounts Payable - T. O. Wentworth," was transferred to Vulcan Account 192E or 192, "Due from Officers," 6 and Account 110, "Notes Receivable - Others," was transferred to Vulcan Account 123, "Notes Receivable - Officers." The major withdrawal in 1964 was of $208,913.88 on September 30, 1964. [1] $204,335.17 of this had been authorized by a resolution of the Board of Directors of Chemical on September 23, 1964. The resolution provided that petitioner would execute a promissory note payable to Chemical for the amount of the "loan." The note was to be prepared by Chemical's counsel, but we find no evidence to indicate that any notes were in fact executed in 1964. *94 This withdrawal was not charged to the notes receivable account. A promissory note was executed on July 1, 1966, six-months after the commencement of an audit of petitioner's tax liabilities. That note states that it was executed "to confirm * * * and to replace" the 1964 note, which "cannot now be located among the corporate records." Approximately $118,600 of the withdrawals in 1964 were used to reduce Vulcan's account 192E, "Due from Officers." The remainder was used for physical additions to petitioner's California home and for other personal expenses. 7 Prior to his withdrawal from the active management of Vulcan and Chemical in April 1964, petitioner's entire effort was expended on behalf of his controlled and substantially wholly owned corporations. During this period, petitioner was the chief executive officer of both companies. Consequently, the business decisions affecting both companies were made by petitioner. Since petitioner made all the business decisions *95 and owned substantially all of the stock of both corporations, he considered himself and the corporations, in layman's terms, as one and the same. At the time he made the withdrawals, petitioner intended to repay them "at a time when - either by a capital gains situation or otherwise it was convenient to do it." In 1967, petitioner had an unaudited statement of his financial situation prepared by an accounting firm at the request of Vulcan's creditors, who were interested in petitioner's personal guarantee of Vulcan debentures. In that statement of petitioner's assets and liabilities as of June 30, 1967, indebtedness to Vulcan for $510,805 was shown as a liability. In debentures issued by Vulcan to its creditors in 1967 petitioner acknowledged that he was indebted to the company for the amount of the withdrawals. 8 In connection with various audits of Chemical and Vulcan since 1964, petitioner has signed audit confirmations in which he has acknowledged this indebtedness. Since 1964, Chemical and, after the merger, Vulcan have reflected the 1964 withdrawals by petitioner as assets on their books. In financial statements of both companies, certified public accountants have *96 treated the 1964 withdrawals as assets. In 1964, petitioner's personal assets consisted of his stock in Vulcan and Chemical, a house in California, and some real estate in Michigan. Although Old Vulcan showed a book value of a little more than two million dollars at its division in 1964, certain values which never appeared on the corporate books were assigned to petitioner's share so that petitioner's new Vulcan would be equal to petitioner's brothers' shares in a two million dollar plant. The assets which were received by petitioner's Vulcan in the reorganization and to which a one million dollar value was "attached" included drawing tables, desks, and some processes of undetermined actual value. Thus in 1964, petitioner believed that his stock in Vulcan was worth roughly one million dollars, the value agreed to at the time of the division. 9 At the beginning of April 1964, Chemical had several processes in various stages of development and one commercialized urea process. On April 10, 1964, Chemical sold the urea process to Allied Chemical for 18,618 shares of Allied stock, which were valued at $879,173.04 on the Chemical books. [2] At the time petitioner made the *97 challenged withdrawals from Chemical, he believed that the Allied stock, combined with a backlog of "what should have and could have been good engineering contracts," made Chemical worth about two million dollars. On November 9. 1964, Chemical's stock in Allied Chemical was pledged to a bank to secure a $900,000 loan to Vulcan. Petitioner's Michigan property, worth between $200,000 and $250,000 in 1964, was mortgaged to provide operating funds for Chemical. Petitioner's property in California was worth $125,000 in 1964. As of December 31, 1964, a note payable in the amount of $105,434.40 was outstanding from Chemical to petitioner. 10 After April 1, 1964, petitioner left the actual management of both Vulcan and Chemical and moved to California. W. H. Stark (hereafter Stark) became president of Vulcan, and Stark and Steer took over the actual management of both companies. From April 1, 1964, through 1965, petitioner was isolated from any meaningful financial data on either Vulcan or Chemical. Whenever he asked for financial reports concerning *98 the companies' operations, he was told that such information was not available. At a meeting in Denver with Stark and Steer in 1966, after the merger of Chemical and Vulcan into one company, petitioner first learned of the almost total economic collapse of Vulcan. Petitioner then decided to return to the active management of the company. He brought in a financial expert who confirmed that Vulcan was virtually bankrupt and that his worth had been substantially dissipated. On June 30, 1967, when petitioner's stock in Vulcan was without value, petitioner had liabilities of $256,461 in excess of his assets according to an unaudited statement of his assets and liabilities. In the notice of deficiency, the Commissioner determined that the withdrawals made by petitioner from Chemical during 1964 were dividends and not bona fide loans. 11 Issue 2 Sometime in 1965, Steer recommended that Chemical redeem all of petitioner's stock. Relying on Steer's advice, petitioner agreed to that redemption. By a formal corporate resolution, dated November 30, 1965, the directors, officers, and stockholders of Chemical consented to and authorized the redemption of petitioner's 2,886 shares *99 of preferred stock and 52.5 shares of common stock for $461,784.06. Sometime between January 5, 1966, and January 15, 1966, Chemical's accountant recorded the redemption in a general journal entry dated November 30, 1965. In April 1966, Chemical's accountant made a general journal entry dated December 31, 1965, purporting to reverse the redemption. The agreement of merger between Chemical and Vulcan, which was executed on January 7, 1966, and filed with the Ohio Secretary of State on January 12, 1966, stated that only Steer's shares were outstanding. The following statement was attached to petitioner's 1965 income tax return, filed July 13, 1966: By purported action of the Board of Directors of Chemical Processes of Ohio, Inc., dated November 30, 1965, the redemption of the entire interest of T. O. Wentworth in said corporation, consisting of 12 52 1/2 shares of common and 2,886 shares of preferred stock of Chemical Processes of Ohio, Inc. were authorized to be redeemed for the sum of $461,784.06. Thereafter, on January 20, 1966, said shares were purportedly cancelled and retired. If any taxable event took place by reason of such purported redemption, such event occurred *100 in 1966. The transaction is being studied to determine its tax consequences. As of December 31, 1964, Chemical had a net worth of $607,973.47. [3] In Chemical's books, an entry, "Per letter from Lybrand, Ross Bros. & Montgomery [the certified public accounting firm for Vulcan] dated December 29, 1965," showed earned surplus of $175,930.92 as of November 30, 1965. That earned surplus would indicate a net worth of $483,930.92 when added to capital stock of $308,000.However, the $175,930.92 earned surplus, entered on Chemical's books by its accountant, did not take into account anticipated losses on certain contracts even though the accountant had prepared records as early as September 30, 1965, showing losses. The anticipated losses were based on two contracts. As of November 30, 1965, Chemical had incurred expenses of $372,168.96 in connection with one contract to build a reactor 13 for a fixed price of $220,032. As of November 30, 1965, Chemical had incurred expenses of $561,861.69 on another *101 contract to build a reactor for the fixed price of $219,739.79. Thus, as of November 30, 1965, Chemical had anticipated losses of $152,136.96 and $342,121.90, a total anticipated loss of $494,258.86. In its 1965 financial statements, these losses were recorded as "anticipated losses on reactor contracts and processes" because Chemical used the completed contract method of reporting income for tax purposes. Section 1701.35(B) of the Ohio Revised Code provides as follows: (B) A corporation shall not purchase its own shares except as provided in this section, nor shall a corporation purchase or redeem its own shares if immediately thereafter its assets would be less than its liabilities plus stated capital, of if the corporation is insolvent, or if there is reasonable ground to believe that by such purchase or redemption it would be rendered insolvent. In the notice of deficiency, the Commissioner determined that during 1965 Chemical actually redeemed 2,886 shares of its preferred stock and 52.5 shares of its common stock from petitioner and that petitioner realized a long-term capital *102 gain in that redemption. 14 OPINION Issue 1 The Commissioner determined that petitioner's withdrawals from Chemical in 1964 constituted dividends taxable under sections 61, 301, and 316, Internal Revenue Code of 1954. [4] Petitioner asserts that those withdrawals were bona fide loans from Chemical. Whether a withdrawal is a loan presents a factual question of the parties' intent to create a bona fide indebtedness. Electric & Neon, Inc., 56 T.C. 1324 (1971). The parties intend a bona fide indebtedness when, at the time of the withdrawals, the shareholder intends to repay the loan and the corporation intends to enforce the obligation. Jack Haber, 52 T.C. 255 (1969), affirmed per curiam 422 F.2d 198 (C.A. 5, 1970). Petitioner and the Commissioner cite numerous guidelines for the determination of the parties' intent: whether the corporation was closely held, whether normal security arrangements were observed, whether *103 the money withdrawn was used for the taxpayer's personal expenses, whether there was a consistent 15 pattern of withdrawals over a long period with only negligible repayments, whether there was an effort to enforce repayment, whether the taxpayer had a definite plan and tangible means of repayment, whether the corporation had large earnings and profits without a dividend paying history, and whether the amounts of the withdrawals were carried on the corporate records as accounts receivable. Petitioner and the Commissioner glean their guidelines from Berthold v. Commissioner, 404 F.2d 119, (C.A. 6, 1968), affirming a Memorandum Opinion of this Court, Elliott J. Roschuni, 29 T.C. 1193 (1958), affd. 271 F.2d 267 (C.A. 5, 1959), certiorari denied, 362 U.S. 988 (1960), Jacob M. Kaplan, 43 T.C. 580 (1965), and others of the numberous cases involving this issue. [5] Such guidelines are helpful, but the ultimate disposition of the question of the parties' intent depends upon a consideration of all of the pertinent facts and circumstances surrounding the withdrawals. Jack Jaber, supra, and Jacob M. Kaplan, supra. *104 16 In Theodore O. Wentworth, supra, we held that petitioner's withdrawals from Old Vulcan in 1957, 1958, and 1959 were bona fide loans rather than constructive dividends. The manner in which petitioner withdrew money from Old Vulcan was not significantly different from the manner in which he withdrew money from Chemical. Old Vulcan charged withdrawals to an account entitled "Due from Officers - T. O. Wentworth," and petitioner signed audit slips confirming his indebtedness. No interest was paid to Old Vulcan, no security was posted, no notes were executed, and no time for repayment was specified. We find no reason to believe that petitioner's attitude toward his withdrawals from Chemical was any different from his attitude toward his earlier withdrawals from Old Vulcan. The Commissioner argues that petitioner was not in control of Old Vulcan and *105 that we should have considered the earlier withdrawals dividends if petitioner had been a controlling shareholder of Old Vulcan. At the time of petitioner's withdrawals from Chemical, he was not managing the daily operations of the company, but in 1957, 1958, and 1959 petitioner was president of Old Vulcan. More significantly, in the earlier case, we considered petitioner's shareholdings important to determine 17 his intent. Now we rely on that case to indicate petitioner's intent rather than to indicate the manner in which to discover that intent. While we agree that special scrutiny is required when a controlling shareholder withdraws funds from his corporation, Elliott J. Roschuni, supra we do not believe that petitioner's attitude towards his withdrawals changed when Old Vulcan was divided and he became the controlling stockholder of a new company. We find additional evidence of petitioner's intent to repay the amounts withdrawn from Chemical. We believe petitioner's testimony that he intended to repay Chemical whenever he could conveniently do so. The fact that there was no definite time for repayment is consistent with the informal nature of petitioner's *106 loan and does not indicate a lack of intent to repay. Petitioner acknowledged and confirmed his indebtedness in connection with audits of the company and in debentures issued by Vulcan to its creditors. In a 1967 statement of his financial situation prepared for creditors of Vulcan who were interested in petitioner's personal guarantee of Vulcan's debentures, petitioner's indebtedness to Vulcan was shown as a liability. 18 Petitioner's capacity to repay is an indication of his intent. Paul Berthold, supra. Petitioner had sufficient assets in 1964 to repay the loans. Moreover, in 1964, petitioner believed that he was worth several million dollars and that he could easily repay the loans. The fact that petitioner's fortunes declined after 1964 indicates nothing about his intent in 1964. As the controlling stockholder, petitioner's intent concerning repayment would have been that of the corporation. The fact that the withdrawals were treated as receivables on the corporate books also indicates that Chemical expected repayment. Most of the 1964 withdrawals were authorized by a corporate resolution which referred to the withdrawals as loans and which required petitioner to *107 execute a note. [6]
The absence of cash dividends does not defeat our determination that petitioner's withdrawals were loans. Chemical's largest earnings occurred in 1964 and represented its 19 receipt of Allied Chemical stock. Similarly, the absence of notes, security, or interest does not defeat our determination, for informal loans are not uncommon in dealings between shareholders and their closely-held corporations. Joseph Miele, 56 T.C. 556, 569 (1971), affd. 474 F.2d 1338 (C.A. 3, 1973) on another point. We conclude that petitioner has sustained his burden of proving that the withdrawals were bona fide loans. Issue 2 The Commissioner determined that all of petitioner's preferred and common stock in Chemical was redeemed on November 30, 1965, and that this redemption resulted in a taxable capital gain under section 302. Petitioner asserts that a redemption of his stock for $416,609.06 would have violated section 1701.35(B) of the Ohio Revised Code and that therefore the purported redemption was a nullity with no taxable *108 consequences. The evidence indicates that both petitioner and Chemical intended a redemption on November 30, 1965. Petitioner discussed the redemption with Chemical's attorney. The redemption was formalized by a corporate resolution, executed by 20 petitioner, and was entered in the corporate financial records. This entry was not reversed until April 1966, after Chemical had been merged into Vulcan. The agreement of merger between Chemical and Vulcan stated that only Steer's stock was outstanding on January 7, 1966. The fact that the redemption may have violated state law does not affect its Federal income tax consequences. In Lodi Iron Works, Inc., 29 T.C. 696 (1958), we held that the issuance of stock which was purportedly void under state law was valid for Federal tax purposes. See also Angelus Building and Investment Co., 20 B.T.A. 667, 673-4 (1930), affd. 57 F.2d 130 (C.A. 9, 1932), certiorari denied 286 U.S. 562 (1932), in which the Board said: If the petitioner and its stockholders violated the laws of California, that is a matter between them and the officials of that State. This fact is not controlling *109 here. In the light of our determination that Chemical's alleged violation of state law is not controlling, we do not consider the Commissioner's argument that Chemical could not anticipate losses to compute its net worth. In other words, we do not decide whether Chemical violated the Ohio statute. We hold 21 that, regardless of state law, Chemical's redemption of petitioner's stock in 1965 resulted in taxable gain. Decision will be entered under Rule 50. Footnotes
1. Of that amount, $84,582.56 was credited as returned on the same date. The amount returned was initially intended to be used to pay petitioner's anticipated income tax liability in the prior case. ↩
2. Vulcan also had an interest in the urea process, which it sold to Allied at the same time for stock worth $120,826.96. ↩
3. If petitioner's 1964 withdrawals were to be considered dividends, Chemical's net worth as of December 31, 1964, would have to be reduced by the amount considered dividends. ↩
4. All statutory references are to the Internal Revenue Code of 1954, unless otherwise stated. ↩
5. Other cases cited include: V. H. Monette & Co., 45 T.C. 15 (1965), Estate of Isadore Benjamin, 28 T.C. 101 (1957), William C. Baird, 25 T.C. 387 (1955), Al Goodman, Inc. 23 T.C. 288, 301 (1954), and Carl L. White, 17 T.C. 1562↩ (1952). 6. Admittedly, the absence of a 1964 note suggests that the requirement of a note was not enforced by Chemical. ↩